**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| MASSIVELY BROADBAND LLC,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 7:26-cv-00461<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff, MASSIVELY BROADBAND LLC ("MASSIVELY BROADBAND"), files this complaint for patent infringement against Apple Inc. ("Apple") and in support thereof alleges and avers as follows:

## NATURE OF THE ACTION

1. Professor Theodore Scott Rappaport, a world-renowned researcher, inventor, and educator, has had a storied career at the cutting edge of wireless communications. Prof. Rappaport's groundbreaking work on radio wave propagation and antennas, wireless communication system design, broadband wireless communications circuits and systems, and millimeter wave frequencies has paved the way for the commercialization of foundational wireless technologies, including 5G. Prof. Rappaport also has made significant contributions to the practice of and education in wireless engineering, including through founding three of the largest U.S. university wireless research centers at Virginia Tech, The University of Texas at Austin and New York University and authoring the world's most popular textbook on the subject of wireless communications.

2. The Asserted Patents in this case are (i) U.S. Patent Nos. 7,676,194 ("'194 Patent"), 8,611,812 ("'812 Patent"), 8,923,754 ("'754 Patent"), 9,667,337 ("'337 Patent"), 10,224,999 ("'999 Patent"), and 10,797,783 ("'783 Patent") (together, the "Intelligent Wireless Broadband Relay Patents"); (ii) U.S. Patent Nos. 8,350,763 ("'763 Patent"), 8,593,358 ("'358 Patent"), 11,063,625 ("'625 Patent"), and 11,876,548 ("'548 Patent") (together, the "Smart Antenna Patents"); and (iii) U.S. Patent No. 8,515,925 ("'925 Patent") (Intelligent Wireless Broadband Relay Patents, Smart Antenna Patents, and '925 Patent collectively the "Asserted Patents"). The Asserted Patents are now owned by MASSIVELY BROADBAND, a company founded and managed by Prof. Rappaport, the named inventor of the Asserted Patents.

3. The Intelligent Wireless Broadband Relay Patents generally describe inventions for intelligent wireless repeaters and relays that receive and retransmit signals or data, including embodiments that support high-bandwidth (e.g., 100 MHz or more) and/or high-data-rate (100 Megabits per second (Mbps) or more) communications. Their intelligence includes, for example, capabilities to process, store, selectively forward, or modify received data; ignore or filter out unwanted transmissions; and prioritize traffic. The disclosed repeaters and relays can also support network security, traffic monitoring and provisioning, and connectivity within or between wireless and wired networks. These capabilities can improve network performance and security, prioritize communications according to application requirements, and facilitate connectivity among wired and wireless devices.

4. The Smart Antenna Patents relate to wireless devices, such as smartphones, tablets and/or laptops, with technologies to control antenna operation and to enable radio circuitry to use a shared antenna in multiple frequency bands. The '763 and '358 Patents relate to wireless devices in which transmitters, receivers, or transceivers operate in different frequency bands using a shared

antenna, including simultaneously. The disclosed technologies include electronically controlled tuning circuitry that is positioned in the signal path between the radio circuitry and a shared antenna, as well as connections between a shared multiband antenna and receiver, transmitter, or transceiver components to support operation in multiple frequency bands, including simultaneously. The disclosed technologies can reduce the number of antennas and associated connections that are needed in a wireless device, and can simplify device design and manufacture. The ’625 and ’548 Patents relate to technologies that use sensor information to determine the location of a user or other structure relative to a wireless device and adjust the radiation pattern of a steerable antenna while operating in the frequency range of 10 GHz to 500 GHz, to avoid directing radiation toward that user or structure. The frequency range of 10 GHz to 500 GHz encompasses bands referred to in the wireless industry as “millimeter wave” (or “mmWave”) and “upper mid-band” spectrum, including 12.7-13.25 GHz, 24 GHz, 28 GHz, 39 GHz, and 42 GHz used for 5G and satellite communications, as well as the V-Band (60 GHz), the E-Band (70/80 GHz), and the D-Band (140 GHz).

5. The ’925 Patent relates to systems and methods that improve the operation of wireless devices and communications networks through location-aware monitoring and responsive device configuration. The disclosed systems combine monitoring applications that obtain radio operating conditions from wireless devices, a computerized database that maintains and updates location-specific communications performance or service-quality information together with records concerning network infrastructure or end-user devices and assets, and electronic interfaces through which that information is updated and accessed. The systems can send instructions to wireless devices to configure or reconfigure their operating parameters based on performance rankings, spectrum usage, interference control, or end-user requests. By linking monitored radio

conditions and updated, location-specific information with responsive control of device operation, these technologies can improve wireless performance and resource efficiency and support remote device monitoring, management, and location-based services.

6. Apple has widely deployed the inventions claimed in the Asserted Patents in various products, including at least: (i) smartphones, e.g., iPhones, operable with 4G LTE or 5G cellular, and/or Wi-Fi 6, 6E, or 7; (ii) tablets, e.g., iPads, operable with 4G LTE or 5G cellular, and/or Wi-Fi 6, 6E, or 7; (iii) laptops, e.g., MacBook Airs and MacBook Pros, operable to provide Wi-Fi 6, 6E, or 7 hotspots; (iv) laptops, including MacBook Pros, having shared multiband antennas connected to receiver, transmitter, or transceiver circuitry supporting simultaneous Wi-Fi and Bluetooth communications, including antenna-array arrangements; and (v) Apple's "Find My" system (together, the "Accused Products").

7. Apple does not have a license to the Asserted Patents. Instead, Apple is flagrantly and willfully infringing the Asserted Patents in violation of the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

**PARTIES**

8. Plaintiff MASSIVELY BROADBAND is a limited liability company organized under the laws of the State of Texas. Prof. Rappaport, sole inventor of the Asserted Patents, is MASSIVELY BROADBAND's sole founder and manager.

9. Upon information and belief, Defendant Apple is a corporation organized under the laws of the State of California, with a place of business at 6900 West Parmer Lane, Austin, TX 78729.

10. Upon information and belief, Apple exercises responsibility and/or control over various infringing activities, including manufacturing and/or having made the Accused Products

and selling, distributing, importing, having sold, and/or having imported those Accused Products in the United States.

## JURISDICTION AND VENUE

11. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*., including 35 U.S.C. § 271.

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13. This Court has personal jurisdiction over Apple in this action because Apple's contacts with the Western District of Texas are significant and pervasive. Apple regularly transacts business in the State of Texas and within this District. Apple engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided in this District and in Texas, and has purposefully established substantial, systematic, and continuous contacts within this District, such that it should reasonably expect to be sued in a court in this District. Given these contacts, the Court's exercise of jurisdiction over Apple will not offend traditional notions of fair play and substantial justice.

14. Venue in the Western District of Texas is proper pursuant to 28 U.S.C. § 1400(b). Apple has a regular and established place of business in this District, including flagship physical campuses in Austin, and has committed acts of infringement within this judicial district giving rise to this action, including designing, testing, and selling the Accused Products in this District.

15. Moreover, this venue is familiar to Apple, which has litigated over 110 federal district court cases in the Western District of Texas over the past five years.

16. Apple is registered to do business in the State of Texas and has been since 1980. Apple has appointed CT Corporation System, located at 1999 Bryan Street, Suite 900, Dallas,

Texas 75201, as its registered agent in Texas.

17. Apple has regular and established places of business in Texas and in this District, including corporate campuses located at Capital Ridge ("Apple Lonestar Design Center"),[1] Riata Crossing ("Riata Crossing"),[2] West Parmer Lane ("Americas Operations Campus"),[3] and a new 133-acre campus 1.5 miles from the Americas Operations Campus ("West Parmer Campus," also called "Capstone")[4] (collectively, "Apple Austin"), in addition to several retail locations.

18. Apple houses major hardware, operations and supply chain, corporate, software and services, support and service, and sales and business development teams at Apple Austin, which has grown and continues to grow in size, scope, and employee population since Apple first moved to Austin in 1992.[5] Upon information and belief, nearly all of Apple's business and corporate divisions have a presence in Austin.[6]

---

[1] Located at or near 320 S. Capital of Texas Hwy (Loop 360), Austin, TX 78746.

[2] Located at or near 12545 Riata Vista Cir, Austin, TX 78727.

[3] Located at or near 5505 W Parmer Ln, Austin, TX 78727. *See also* Lyndsey Taylor, *New Apple Complex on Parmer Lane Could Be Complete by End of 2014*, Community Impact (Jan. 27, 2014), https://communityimpact.com/northwest-austin/news/new-apple-complex-on-parmer-lane-could-be-complete-by-end-of-2014-2/.

[4] Located at or near 6900 W Parmer Ln, Austin, TX 78729.

[5] *See* Apple, *Austin* (last accessed Oct. 28, 2026), https://www.apple.com/careers/us/work-at-apple/locations/austin.html ("Apple Austin, a vibrant location at the intersection of tech and the arts."); *see also* Don Reisinger, *Where Apple Has Quietly Built Its Biggest Campus*, Fortune (Sept. 1, 2016), https://fortune.com/2016/09/01/apple-austin-campus/ ("Apple's presence in Austin, which dates back to 1992, has fluctuated over time. But in recent years, the city has become a major hub for the company as it expanded outside its Silicon Valley base.").

[6] *See* Cody Baird, *Apple Plans Multimillion-Dollar Renovation at Longtime North Austin Campus*, Austin Business Journal (Apr. 3, 2024), https://www.bizjournals.com/austin/news/2024/04/03/apple-to-build-lab-space-older-w-parmer-ln-campus.html.

19. Over the past decade, Apple has undertaken a "broad expansion" in Austin.[7] Apple's then-CEO, Tim Cook, stated that Apple has a "close bond with the city" of Austin which Apple's "talented and diverse workforce" "calls . . . home."[8] According to Apple's Chief Hardware Officer, Johny Srouji, Apple sought to avail itself of Austin's local workforce, university, and other resident companies: "The reason [Apple] came to Austin is there is a strong pool of talent[.] . . . There are lots of high-tech companies, and also The University of Texas."[9]

20. Upon information and belief, Apple opened its first engineering operation in Austin in 2010 with a 100-person team that contributed significantly to Apple's "A" series processors and other components for the iPhone and iPad.[10]

21. Upon information and belief, in or around 2015, Apple purchased the Riata Crossing complex in Austin in which it had been a tenant.[11] Riata Crossing encompasses four buildings and 350,000 square feet.[12]

22. In 2016, Apple opened its Lonestar Design Center at Capital Ridge in Austin. Upon information and belief, the Lonestar Design Center encompasses 215,000 square feet and has the capacity to hold 1,000 workers; in 2016, 500 Apple hardware and software engineers were based at the Center.[13] Mr. Srouji described the engineers at Apple's Lonestar Design Center as "one of

---

[7] *See* Apple, *Apple Expands in Austin*, Apple Newsroom (Nov. 20, 2019), https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/.

[8] *See id.*

[9] *See* Lori Hawkins, *Apple Dives Deeper into Austin's Talent Pool*, Austin American-Statesman (Sep. 7, 2016), https://www.statesman.com/story/news/2016/09/07/apple-dives-deeper-into-austins-talent-pool/10173792007/.

[10] *See id.*

[11] *Id.*

[12] *Id.*

[13] *See id.*

[Apple's] most important engineering groups" who "design[] chips that go into all the devices [Apple] sell[s]."[14]

23. Also in 2016, upon information and belief, Apple completed construction of its 38-acre Americas Operations Campus at West Parmer Lane.[15] Upon information and belief, the Americas Operations Campus, which encompasses seven buildings and 1.1 million square feet, is Apple's hub for managing its business operations throughout the Western hemisphere, including "finance, human resources, corporate sales, customer support, information systems[,] and accounting."[16]

24. In 2019, Apple announced it had broken ground on its $1 billion West Parmer Campus, a new 133-acre campus 1.5 miles from the Americas Operations Campus.[17] Apple's West Parmer Campus will encompass 3 million square feet and have the capacity to house 15,000 Apple employees.[18] In a press release announcing the new West Parmer Campus, Apple stated it was "proud . . . to significantly deepen [Apple's] quarter-century partnership with the city and people of Austin."[19]

25. As of 2025, thousands of Apple employees worked in the three completed buildings at the West Parmer Campus even as construction continued on expansive research and development labs for Apple's Hardware Engineering, Hardware Technology, and Software

---

[14] *See id.*

[15] *See id.*

[16] *Id.*

[17] *See* Apple, *Apple Expands in Austin*, Apple Newsroom (Nov. 20, 2019), https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/.

[18] *See id.*

[19] *See* Apple, *Apple to Build New Campus in Austin and Add Jobs across the US*, Apple Newsroom (Dec. 13, 2018), https://www.apple.com/newsroom/2018/12/apple-to-build-new-campus-in-austin-and-add-jobs-across-the-us/.

Engineering teams.[20]

26. Kristina Raspe, Apple's Vice President of Worldwide Real Estate and Facilities, stated that Apple is "thrilled to be deepening [its] partnership with the city and people" of Austin through Apple's continued expansion of its West Parmer Campus.[21]

27. Apple previously announced that it was "spending tens of billions of dollars" on "silicon engineering and 5G technology" in nine states, including Texas.[22]

28. Apple also announced that it is planning a $4.5 million renovation to its Americas Operations Campus.[23]

29. Upon information and belief, as of late 2023, Apple was one of the largest high-tech employers in the Austin metro area.[24]

30. Upon information and belief, Apple has received millions of dollars in tax incentives from city, county, and state governments in Texas to expand its footprint in Austin.

31. Upon information and belief, Apple is currently advertising more than 490 employment opportunities on its Hardware, Software and Services, and Design teams at Apple

---

[20] *See* Apple, *Apple Increases U.S. Commitment to $600 Billion, Announces American Manufacturing Program*, Apple Newsroom (Aug. 6, 2025), https://www.apple.com/newsroom/2025/08/apple-increases-us-commitment-to-600-billion-usd-announces-ambitious-program/.

[21] *See* Iain Oldman, *Apple Employees to Move into New Northwest Austin Campus in 2022*, Community Impact (Apr. 27, 2021), https://communityimpact.com/northwest-austin/impacts/apple-employees-to-move-into-new-northwest-austin-campus-in-2022/.

[22] *See* Apple, *Apple Commits $430 Billion in US Investments over Five Years*, Apple Newsroom (Apr. 26, 2021), https://www.apple.com/newsroom/2021/04/apple-commits-430-billion-in-us-investments-over-five-years/.

[23] *See* Cody Baird, *Apple Plans Multimillion-Dollar Renovation at Longtime North Austin Campus*, Austin Business Journal (Apr. 3, 2024), https://www.bizjournals.com/austin/news/2024/04/03/apple-to-build-lab-space-older-w-parmer-ln-campus.html.

[24] *See id.*

Austin.[25] Apple is also currently advertising more than 70 employment opportunities at Apple Austin on its Marketing, Corporate, and Sales and Business Development teams.[26]

32. Upon information and belief, Apple employees have worked on research, development, and testing of the Accused Products in this District, including at Apple Austin, as evidenced by recent posts on Apple's website advertising employment opportunities at Apple Austin:

- **Wireless Network Reliability Engineer, Infrastructure Services:** Responsibilities include "[d]esign, plan and deploy enterprise-grade wireless network infrastructure (Wi-FI 6/6E/7, cellular, and private 5G) across store, campus, and branch environments";[27]

- **RFIC [Radio Frequency Integrated Circuit] Layout Engineer:** Responsibilities include "[d]etailed transistor-level layout of RF [radio frequency] and analog circuit blocks including LNA [low noise amplifier], mixers, PLL [phase-locked loop], LO generation, modulators, power amplifiers, ADC/DAC, baseband filters, and bandgap/bias/LDO";[28]

- **Wireless Systems Researcher:** Responsibilities include researching questions related to "RF/wireless product development" and "RF/wireless connectivity";[29] and

- **Wireless Module Engineer:** Responsibilities include "driving the development of wireless modules from early architecture definition through

---

[25] *Careers at Apple*, Apple (last visited Oct. 28, 2026), https://jobs.apple.com/en-us/search?location=united-states-USA.

[26] *Id.*

[27] *Careers at Apple*, Apple (Oct. 6, 2026), https://jobs.apple.com/en-us/details/200686684-0240/wifi-network-reliability-engineer-infrastructure-services?team=SFTWR.

[28] *Careers at Apple*, Apple (Oct. 27, 2026), https://jobs.apple.com/en-us/details/200691821-0157/rfic-layout-engineer?team=HRDWR.

[29] *Careers at Apple*, Apple (July 16, 2026), https://jobs.apple.com/en-us/details/200672677-0157/wireless-systems-researcher?team=HRDWR.

mass-production ramp."[30]

33. Upon information and belief, Apple employees located at Apple Austin have worked on the Accused Products.

34. Upon information and belief, those Apple employees include (i) Wenpeng Wang, a senior systems engineer based at Apple Austin who "focus[es] on making wireless connectivity reliable in the moments that matter to users[]";[31] (ii) Kavya Gupta, an RF systems engineer based at Apple Austin; (iii) Munish Sharma, an engineering manager based at Apple Austin who works on RF and mmWave products; (iv) Matthew Peterman, a network engineering manager based at Apple Austin; (v) Ridhwan Mirza, an antenna engineering program manager based at Apple Austin who works on in-product antenna design; (vi) Yannick Leclercq, a senior engineering manager based at Apple Austin; and (vii) Martin Blasczyk, a wireless module test engineer based at Apple Austin.

35. Upon information and belief, Apple Austin also is strategically located near several semiconductor manufacturing plants in Austin, Texas, including NXP Semiconductors, Applied Materials, GlobalFoundries Inc., and Broadcom Inc., and a design center operated by Taiwan Semiconductor Manufacturing Company.

36. Apple announced in August 2025 that it was working with GlobalFoundries Inc. and Broadcom Inc. "to develop and manufacture . . . cellular semiconductor components in the U.S." that are "crucial for 5G communications in Apple products."[32] Apple also announced it was

---

[30] *Careers at Apple*, Apple (Aug. 28, 2026), https://jobs.apple.com/en-us/details/200680660-0157/wireless-module-engineer?team=HRDWR.

[31] *Wenpeng Wang*, LinkedIn, https://www.linkedin.com/in/wpwang (last visited Nov. 12, 2026).

[32] *See* Apple, *Apple Increases U.S. Commitment to $600 Billion, Announces American Manufacturing Program*, Apple Newsroom (Aug. 6, 2025),

"partnering directly with Applied Materials to boost the production of semiconductor manufacturing equipment in the U.S." and highlighted that "[t]he Applied [Materials] site in Austin, Texas, is a pivotal hub for manufacturing cutting-edge chip equipment."[33]

37. Apple sells and offers for sale the Accused Products throughout the United States, including in Texas and this District.

38. For example, the iPhone 12 (A2172), iPhone 13 Pro Max (A2484), and iPad Pro 13-inch (A2926) have been available for purchase through the Apple website, which indicates Apple will ship purchased products directly to customers in Texas and this District.

39. Accused Products likewise have been sold in this District through, *inter alia*, the five (5) physical stores Apple maintains in this District, located at or near: (i) 2901 S. Capital of Texas Highway, Austin, Texas 78746, (ii) 3121 Palm Way, Austin, Texas 78758, (iii) 7400 San Pedro Avenue, San Antonio, Texas 78216, (iv) 15900 La Cantera Parkway, San Antonio, Texas 78256, and (v) 8401 Gateway Boulevard West, El Paso, Texas 79925.[34]

40. Accused Products also have been sold in this District through, *inter alia*, the physical and online stores of authorized Apple retailers such as Best Buy, Wal-Mart, and Target.

## FACTUAL BACKGROUND

### A. Prof. Rappaport's Work in Wireless Communications

41. Prof. Rappaport is an acclaimed figure in the field of wireless communications and has spent over four decades doing cutting edge work in both academia and the industry.

42. Prof. Rappaport is currently the David Lee/Ernst Weber Professor of Electrical and

---

https://www.apple.com/newsroom/2025/08/apple-increases-us-commitment-to-600-billion-usd-announces-ambitious-program/.

[33] *See id.*

[34] *See* Apple, *Apple Retail Stores, United States*, https://www.apple.com/retail/storelist/.

Computer Engineering at the New York University Tandon School of Engineering. Prof. Rappaport also holds co-appointments as a Professor of Computer Science at the Courant Institute of Mathematical Sciences at NYU and as a Professor of Radiology at NYU Langone Health.

43. Prof. Rappaport is a member of the 2024-2025 class of Hagler Fellows at the Hagler Institute for Advanced Study at Texas A&M University in College Station, Texas. The selection to be a Hagler Fellow is an honor bestowed upon "top scholars who have distinguished themselves through outstanding professional accomplishments or significant recognition."[35]

44. Prof. Rappaport also has been named a Neil Armstrong Distinguished Visiting Professor at Purdue University for 2024–2027. The Neil Armstrong Distinguishing Visiting Professors Program brings "highly accomplished and recognized scholars and practitioners" that are "preeminent in their fields" to Purdue to "advance interdisciplinary collaboration, engage with students and faculty, and foster global partnerships, driving groundbreaking research and advancing Purdue's mission of innovation."[36]

45. Prof. Rappaport began his academic career at Purdue University, where he obtained his BS, MS, and PhD, after which he began teaching as a professor at Virginia Tech in 1988. In 2002, Prof. Rappaport became the William and Bettye Nowlin Professor of Engineering at The University of Texas at Austin ("UT Austin"), where he taught for a decade before transitioning to NYU. In over three decades as a professor and thesis advisor at leading institutions, Prof. Rappaport has played a formative role in teaching the next generation of wireless researchers.

---

[35] *See* Hagler Institute for Advanced Study, *Hagler Fellows*, Texas A&M University, https://hias.tamu.edu/faculty-fellows/ (last visited May 12, 2025).

[36] *See* Purdue University College of Engineering, *Neil Armstrong Distinguished Visiting Professors*, Purdue University, https://engineering.purdue.edu/NADVP (last visited May 12, 2025).

46. Prof. Rappaport founded several of the largest and most prominent academic wireless research centers in the United States, including (i) the Mobile and Portable Radio Research Group ("MPRG") at Virginia Tech, one of the world's first academic research centers for wireless communications, in 1990, (ii) the Wireless Networking and Communications Group ("WNCG") at UT Austin in 2002, and (iii) NYU WIRELESS, an interdisciplinary center combining wireless engineering, computer science, and medicine in 2012.

47. At UT Austin, Prof. Rappaport launched an annual wireless communications education conference (formerly known as the Texas Wireless Summit and now called the 6G@UT Forum, co-sponsored by Ericsson), bringing together students, business leaders, and technical innovators in the industry. Subsequently, while at NYU, Prof. Rappaport founded the Brooklyn 5G summit (now called the Brooklyn AI-Native 6G Summit), a premier technical meeting co-sponsored by Nokia/Bell Labs. This annual invitation-only event brings together executives from prominent global wireless companies and leading researchers to discuss the future of wireless. The event is broadcast live online by the Institute of Electrical and Electronics Engineers ("IEEE"). Prof. Rappaport received the Lifetime Academic Achievement Award at the 2026 Brooklyn AI-Native 6G Summit.

48. Prof. Rappaport's renown in the field is reflected in numerous awards and recognitions, including: (i) induction into the American Academy of Arts & Sciences in 2026; (ii) elevation to Life Fellow of the IEEE in 2025; (iii) election as a Fellow of the Association for Computing Machinery in 2025; (iv) receipt of the 2025 IEEE Communications Society Award for Advances in Communication; (v) receipt of the NYU Tandon School of Engineering Excellence in Research Award in 2025; (vi) induction into the elite IEEE Vehicular Technology Hall of Fame in 2024; (vii) receipt of the NYU Research Catalyst Prize in 2022; (viii) election as a member of

the National Academy of Engineering in 2021 for contributions to the characterization of radio frequency propagation in millimeter wave bands for cellular communication networks; (ix) receipt of the 2021 IEEE Global Communications Best Paper Award for the Wireless Communications Symposium; (x) receipt of the 2020 IEEE Eric E. Sumner Award for pioneering contributions to radio channel modeling and characterization, and millimeter wave communication systems; (xi) induction into the Wireless History Foundation Wireless Hall of Fame in 2019; and (xii) receipt of the 2018 Armstrong Medal from the Radio Club of America, the world's oldest radio society.

**B. The Asserted Patents**

49. Prof. Rappaport is the sole named inventor of the Asserted Patents.

50. On March 9, 2010, the USPTO duly and legally issued the '194 Patent, titled "Broadband Repeater with Security for Ultrawideband Technologies." A true and accurate copy of the '194 Patent is attached hereto as Exhibit 1.[37]

51. On December 17, 2013, the USPTO duly and legally issued the '812 Patent, titled "Broadband Wireless Relay." A true and accurate copy of the '812 Patent is attached hereto as Exhibit 2.

52. On December 30, 2014, the USPTO duly and legally issued the '754 Patent, titled "Intelligent Broadband Relay for Wireless Networks." A true and accurate copy of the '754 Patent

[37] The '194, '754, '337, '999, '783, '763, '358, '625, '548, and '925 Patents are subject to pending *ex parte* reexaminations ("EPR") initiated by Samsung Electronics America, Inc. and/or Samsung Electronics Co. Ltd. ("Samsung") during the pendency of the case *MASSIVELY BROADBAND LLC v. Samsung Elecs. Co., Ltd., et al.* ("*MBB v. Samsung*"), No. 2:24-CV-00608-JRG (E.D. Tex.). *See* Reexamination Control Nos. 90/016,194; 90/016,339; 90/016,338; 90/016,332; 90/016,234; 90/016,235; 90/016,236; 90/016,245; 90/016,325; 90/016,193. Samsung filed the EPRs after the Patent Trial and Appeal Board denied Samsung's *inter partes* review of those Patents on discretionary grounds. MASSIVELY BROADBAND has filed petitions to terminate all pending EPRs under 35 U.S.C. § 325(d). The United States Patent and Trademark Office has not yet decided any of the petitions.

is attached hereto as Exhibit 3.

53. On May 30, 2017, the USPTO duly and legally issued the ’337 Patent, titled “Intelligent Broadband Relay for Wireless Networks for Connectivity to Mobile or Portable Devices.” A true and accurate copy of the ’337 Patent is attached hereto as Exhibit 4.

54. On March 5, 2019, the USPTO duly and legally issued the ’999 Patent, titled “Broadband Repeater with Security for Ultrawideband Technologies.” A true and accurate copy of the ’999 Patent is attached hereto as Exhibit 5.

55. On October 6, 2020, the USPTO duly and legally issued the ’783 Patent, titled “Broadband Repeater with Security for Ultrawideband Technologies.” A true and accurate copy of the ’783 Patent is attached hereto as Exhibit 6.

56. On January 8, 2013, the USPTO duly and legally issued the ’763 Patent, titled “Active Antennas for Multiple Bands in Wireless Portable Devices.” A true and accurate copy of the ’763 Patent is attached hereto as Exhibit 7.

57. On November 26, 2013, the USPTO duly and legally issued the ’358 Patent, titled “Active Antennas for Multiple Bands in Wireless Portable Devices.” A true and accurate copy of the ’358 Patent is attached hereto as Exhibit 8.

58. On July 13, 2021, the USPTO duly and legally issued the ’625 Patent, titled “Steerable Antenna Device.” A true and accurate copy of the ’625 Patent is attached hereto as Exhibit 9.

59. On January 16, 2024, the USPTO duly and legally issued the ’548 Patent, titled “Steerable Antenna Device.” A true and accurate copy of the ’548 Patent is attached hereto as Exhibit 10.

60. On August 20, 2013, the USPTO duly and legally issued the ’925 Patent, titled

"Clearinghouse System, Method, and Process for Inventorying and Acquiring Infrastructure, Monitoring and Controlling Network Performance for Enhancement, and Providing Localized Content in Communication Networks." A true and correct copy of the '925 Patent is attached hereto as Exhibit 11.

61. MASSIVELY BROADBAND is the owner of all right, title, and interest in and to the Asserted Patents, by assignment from Prof. Rappaport.

62. MASSIVELY BROADBAND has not made, offered for sale, or sold within the United States, or imported into the United States, any article covered by the Asserted Patents.

63. During the period for which MASSIVELY BROADBAND seeks pre-suit damages, no licensee or other person acting for or under MASSIVELY BROADBAND made, offered for sale, or sold within the United States, or imported into the United States, any article covered by the Asserted Patents.

64. Accordingly, no patented articles required marking under 35 U.S.C. § 287(a) during the relevant pre-suit period.

### i. The Intelligent Wireless Broadband Relay Patents

65. The Intelligent Wireless Broadband Relay Patents generally describe inventions that involve intelligent wireless repeaters and relays that receive and retransmit signals or data, including embodiments that support bandwidths of 100 MHz or more and/or data rates of 100 Megabits per second (Mbps) or more. Their intelligence includes, for example, capabilities to process, store, selectively forward, or modify received data; ignore or filter out unwanted transmissions; and prioritize traffic according to application requirements. The disclosed repeaters and relays can also support network security, traffic monitoring and provisioning, and connectivity within or between wireless and wired networks. These capabilities can improve network

performance and security while accommodating communications with different bandwidths, priority, and real-time requirements.

66. The Intelligent Wireless Broadband Relay Patents claim priority to an application (Serial No. 10/919,515) filed August 17, 2004, and two provisional applications (Serial Nos. 60/496,913 and 60/498,324) filed August 22, 2003 and August 28, 2003, respectively.

67. In 2003, most cell phones operated on 2G networks, whose channels had bandwidths of about 0.2 MHz to 1.25 MHz, and data rates up to 0.384 Mbps, depending on the type of 2G network. Cell phones at that time also were not equipped for Wi-Fi communications. The modern era of ubiquitous smartphones, tablets, and ultra-thin laptops with high-speed wireless connectivity had not yet arrived.

68. Nevertheless, the descriptions for the Intelligent Wireless Broadband Relay Patents, which date back to 2003, presaged a time when wide-bandwidth and high-data-rate wireless devices would "proliferate." *See* Ex. 1, '194 Patent at col. 1:20-32. The Intelligent Wireless Broadband Relay Patents define "ultrawideband" as "any type of electromagnetic signals that have an instantaneous or overall occupied bandwidth of 100 MHz or more and that are used to communicate or to position-locate between 2 or more devices." *Id.* at col. 3:57-59. A bandwidth of 100 MHz is nearly two orders of magnitude greater than the bandwidths of the 2G cellular channels available in 2003.

69. Prof. Rappaport recognized that, for a given RF transmit-power level, a larger channel bandwidth generally implies a proportionally higher noise-floor power level. As the Intelligent Wireless Broadband Relay Patents explain, ultrawideband devices generally must therefore be physically closer together to obtain a stronger signal-to-noise ratio (SNR) than equal-power devices using narrower channels. *See id.* at col. 3:66–4:5.

70. To combat this connectivity problem, along with the increased traffic, security, and bandwidth-provisioning demands that an anticipated proliferation of ultrawideband devices would bring, Prof. Rappaport envisioned and invented repeaters or relays "tailored for easy and rapid deployment to facilitate the interconnection of network devices using ultrawideband radio …." *Id.* at col. 3:51-56.

71. Prof. Rappaport further envisioned that proliferating ultrawideband devices would face increased interference, spam traffic, and security attacks from rogue or spoofed message sources or unwanted transmitters. *Id*. at col. 4:8–13. Thus, his inventive repeaters included "the ability to detect and process such unwanted traffic in a personal or local area network, as well as to report back attempted breaches of security or interference sources to a network controller or host device which is connected to the internet." *Id*. at col. 4:13-18.

72. Claim 1 of the '754 Patent recites an example of Prof. Rappaport's intelligent wireless repeater or relay, stating:

> *1. A broadband wireless repeater or relay, comprising:*
>
> *at least one receiver or transceiver for signal or data reception from one or more devices;*
>
> *at least one transmitter or transceiver for signal or data transmission to one or more devices, wherein the transceiver for signal or data reception and the transceiver for signal or data transmission may be the same or different; and*
>
> *a controller that is configured or configurable for operation in one or more wireless networks, said controller communicating with said at least one receiver or transceiver for signal or data reception and said at least one transmitter or transceiver for signal or data transmission,*
>
> *wherein at least one of said receiver or transceiver for signal or data reception and said transmitter or transceiver for signal or data transmission either or both transmit and receive at an instantaneous or overall occupied bandwidth of 100 MHz or more or have a data transmission rate of 100 Megabits per second or more,*
>
> *wherein said controller is configured or configurable to perform or for performing a plurality of:*

> *a) ignore or filter out at least some signal or data transmissions from one or more undesired transmitters, users, networks, data sources, or noise sources;*
>
> *b) instruct one or more devices or networks to ignore or disregard at least some signal or data transmissions of one or more undesired transmitters, undesired users, undesired networks, or noise sources; and*
>
> *c) network provisioning or monitoring.*

*See* Ex. 3, '754 Patent at col. 22:37-65.

73. The inventive wireless repeater or relay can act as a hotspot between two wireless networks, such as a cellular network and a Wi-Fi network. Claim 1 of the '754 Patent expressly permits the bandwidth or data-rate requirement to be satisfied by at least one of the receiving or transmitting components, which may transmit or receive at an instantaneous or overall occupied bandwidth of 100 MHz or more, or have a data transmission rate of 100 Mbps or more. *See* Ex. 3, '754 Patent at claim 1.

74. Wireless communication technologies that have channels with a bandwidth of 100 MHz or more and/or that have a data transmission rate of 100 Mbps or more include, but are not limited to:

(a) Wi-Fi 5 (IEEE 802.11ac), Wi-Fi 6 (IEEE 802.11ax) and Wi-Fi 6E (also IEEE 802.11ax), all of which support 160 MHz channels and typical user data rates of between about 200 and 600 Mbps;

(b) LTE-Advanced systems using carrier aggregation, which combines multiple component carriers to support increased transmission bandwidths, including configurations aggregating five 20 MHz component carriers for a total nominal channel bandwidth of 100 MHz;

(c) 5G New Radio ("NR") cellular, which has several bands (including but not limited to band n41, n48, n77, n78, n79, n90, n257, n258, n259, n260, n261) that have bandwidths of 100 MHz or more, and average data rates greater than 100 Mbps; and

(d) Citizens Broadband Radio Service ("CBRS")-based 5G deployments, including operations in LTE Band 48 and 5G NR Band n48, which can aggregate multiple 10 MHz channels to achieve total bandwidths approaching 100 MHz under the CBRS spectrum sharing framework.

75. The Intelligent Wireless Broadband Relay Patents further describe configurations in which the inventive wireless repeater or relay connects to a wired network or Internet backbone. *See, e.g.*, Ex. 1, ’194 Patent at col. 19:1–25. In such a configuration, the repeater or relay can function as an access point or wireless router, providing Internet connectivity to ultrawideband devices.

76. Various claims of the ’194, ’812, ’754, ’337, and ’999 Patents recite that the repeater or relay uses “MIMO technologies” (Ex. 2, ’812 Patent at claim 25) or “MIMO or adaptive antenna technology ….” *See* Ex. 3, ’754 Patent at claim 13; *see also* Ex. 1, ’194 Patent at claim 8; Ex. 4, ’337 Patent at claim 17; and Ex. 5, ’999 Patent at claim 12.

77. “MIMO” antennas in the context of the Intelligent Wireless Broadband Relay Patents refer to multiple-input multiple-output antennas. *See, e.g.*, Ex. 3, ’754 Patent at col. 6:8-9, col. 9:45-46.

78. A MIMO antenna system employs multiple antennas at both the transmitting and receiving ends of a wireless communication link and uses signal processing to exploit the different propagation paths between them. Such a configuration can enhance performance and capacity, for example, by transmitting multiple data streams concurrently over the same frequency resources, thereby increasing data rates and spectral efficiency, or by combining or selecting signals received through different paths to improve link reliability and reduce the effects of fading and interference.

79. The Intelligent Wireless Broadband Relay Patents disclose integrating MIMO antenna capabilities with RF control, baseband processing, and the repeater’s processing and filtering of received signals or data. As the Intelligent Wireless Broadband Relay Patents explain, controlling RF antenna signals in conjunction with baseband processing enables MIMO techniques to improve link quality. *See* Ex. 1, ’194 Patent at col. 9:36–40. The disclosed architecture can use

antenna selection and signal-combining techniques to improve communications under varying propagation and interference conditions.

80. Various claims of the Intelligent Wireless Broadband Relay Patents recite that the wireless repeater or relay transmits "beacon frames." *See* Ex. 6, '783 Patent at claim 1; Ex. 5, '999 Patent at claim 32.

81. Beacon frames provide data or signals broadcast at preset intervals by a wireless transmitter that enable receiving devices to determine the transmitter's presence and network information. In the context of the Intelligent Wireless Broadband Relay Patents, beacon frames are not limited to a particular protocol layer.

82. In UMTS 4G-LTE and 5G NR cellular systems, system-information messages broadcast over a Broadcast Control Channel ("BCCH") perform this beacon function by providing network information to receiving devices. These messages originate at the Radio Resource Control ("RRC") layer and pass through the MAC and physical layers for transmission; their passage through those layers does not limit them to MAC-layer frames. *See* 3GPP TS 36.331 § 5.2 (4G-LTE system-information broadcast); 3GPP TS 38.331 § 5.2 (5G NR system-information broadcast); *see also* 3GPP TS 25.301 V4.3.0, p. 30 (Release 4) (BCCH control-plane protocol stack).

83. In Wi-Fi networks, including Wi-Fi 5, 6, and 6E, beacon frames are implemented as management frames that are transmitted periodically to announce the presence of a wireless network and that provide timing information for synchronizing communications with devices using the network. This management-frame implementation is one example of beacon functionality, rather than a limitation on the beacon frames described and claimed in the Intelligent Wireless Broadband Relay Patents. *See* ETSI TS 125 221 V4.3.0 (Dec. 2001), § 6.51, p. 51 (3GPP

TS 25.221, Release 4).

84. The inventions claimed in the Intelligent Wireless Broadband Relay Patents, including claim 1 of the ’754 Patent recited above, address technological problems and provide technological solutions through the claimed combinations of receiver, transmitter or transceiver, and controller functionality that were not well-understood, routine, or conventional in the 2003–2004 time frame.

85. A person of ordinary skill in the art reading the Intelligent Wireless Broadband Relay Patents and their claims would understand that (a) the disclosures and claims of the Intelligent Wireless Broadband Relay Patents are drawn to solving specific, technical problems; (b) the claimed subject matter represents an advancement in the technical field of the Intelligent Wireless Broadband Relay Patents because, among other things, when the Intelligent Wireless Broadband Relay Patents were written, wireless communication devices and networks with much greater bandwidth and vast quantities of data had not yet proliferated; and (c) the claimed subject matter represents an advancement in the technical field of the Intelligent Wireless Broadband Relay Patents because, among other things, at the time Prof. Rappaport invented the Intelligent Wireless Broadband Relay Patents, severe interference and network management issues in the vicinity of other wireless high-data-rate devices were expected to become increasingly demanding as high-data-rate wireless devices proliferated.

86. A wireless repeater or relay, with a receiver, transmitter, and/or transceiver that operates at an “instantaneous or overall occupied bandwidth of 100 MHz or more or have a data transmission rate of 100 Megabits per second or more” solves the technical problem of connecting ultrawide bandwidth devices over greater distances than a single ultrawide bandwidth device could connect by itself. *See* Ex. 1, ’194 Patent at col. 4:5-7. Further, the controller addresses the

technical problem of preventing a range-extending repeater or relay from propagating unwanted transmissions and enabling the network to detect and respond to those transmissions by providing technical functionality beyond range extension: it is configured or configurable to perform a plurality of functions to ignore or filter undesired transmissions, to instruct other devices or networks to disregard undesired transmissions, and to perform network provisioning or monitoring. These capabilities enable the repeater or relay to control which received traffic is retransmitted and how traffic is handled, which improves the efficiency, reliability, and security of wireless communications.

87. The claims of the Intelligent Wireless Broadband Relay Patents recite intelligent features that are beneficial to the connected devices, such as processing received data to determine what should be transmitted by the wireless repeater or relay. Additional claims recite MIMO antennas and transmission of beacon frames, and thus do not preempt the entire field of repeater and relay technology (i.e., those claims do not cover repeater and relay technologies that do not use MIMO antennas and/or transmit beacon frames).

88. The claims of the Intelligent Wireless Broadband Relay Patents address technical problems in wireless communications, including the enablement of high-bandwidth or high-data-rate devices to communicate within networks over greater distances while providing intelligent processing and selective handling of received traffic. The disclosed architecture combines signal reception and retransmission with processing and control capabilities that can suppress unwanted traffic, prioritize desired communications, and improve network performance and security.

**ii. Smart Antenna Patents**

89. The Smart Antenna Patents relate to wireless devices in which radio circuitry, tuning circuitry, or sensor-responsive antenna control enables shared multiband antenna use or

adjustment of an antenna's radiation pattern.

90. The '763 and '358 Patents claim priority to a non-provisional application (Serial No. 12/541,764), filed on August 14, 2009, and to a provisional application (Serial No. 61/088,829) filed on August 14, 2008.

91. Tuning circuitry placed between the radio circuitry and an antenna can improve the transfer of signal power between the radio circuit and the antenna at the operating frequencies by reducing power reflected back by the antenna rather than transferred through the connection.

92. The '763 and '358 Patents explain that mobile devices conventionally used multiple antennas designed for different communication bands, such as cellular and Wi-Fi bands, which operate at substantially different frequencies. *See* Ex. 7, '763 Patent at col. 1:20–27. Fitting and engineering multiple antennas into small mobile devices, however, is difficult, time-consuming, and expensive, especially considering applicable radiation-efficiency requirements and power considerations. *Id*. at col. 1:28–42, col. 9:57–58.

93. Later developments in cellular communications, including 4G LTE and 5G NR, have increased the importance of supporting multiple frequency bands within a compact mobile device. Technologies such as carrier aggregation, LTE–NR dual connectivity, and multi-link operation (MLO) in Wi-Fi enable devices to transmit or receive using multiple frequency bands simultaneously, rather than operating on only one band at a time. Providing a separate antenna and associated connections for each supported band would compound the space constraints, mechanical-design complexity, and manufacturing costs as identified in the '763 and '358 Patents. The use of carrier aggregation, LTE–NR dual connectivity and MLO to operate across multiple cellular or Wi-Fi frequency bands simultaneously illustrates the continuing importance of the disclosed approaches in the '763 and '358 Patents, i.e., to use controlled tuning circuitry to permit

a shared antenna to serve radio circuitry operating in multiple different bands, including simultaneously.

94. To reduce the number of antennas needed in mobile devices, the ’763 and ’358 Patents describe using a shared antenna for multiple transmitters, receivers, or transceivers operating in different frequency bands, including simultaneously, “thereby greatly simplifying the antenna structures in a portable wireless device, and greatly reducing the mechanical design complexity, the cost of bill of materials, and the variance in manufacturing of different devices of a particular model.” Ex. 7, ’763 Patent at col. 3:61–67. In the tuning implementations disclosed in the ’763 and ’358 Patents, tuning circuitry is positioned in the signal path between the radio circuitry and the antenna, rather than within the antenna structure itself. *See id*. at Figs. 5, 6A–6C.

95. The ’763 and ’358 Patents explain that the shared antenna may include multiple antenna elements or sub-elements to form an antenna array. *See id*. at col. 9:63–10:6. In the tuning implementations disclosed in the ’763 and ’358 Patents, the antenna may be actively tuned or tuned by passive elements that are selected or interconnected using electronic control, where the tuning circuitry is positioned in the signal path between the radio circuitry and the antenna. *See id.* at claim 1, Figs. 6A–6C.

96. Claim 6 of the ’763 Patent recites an example of a wireless device with Prof. Rappaport’s tunable antenna, stating:

> *6. A wireless device, comprising:*
>
> *one or more antennas;*
>
> *at least one multiband transmitter, receiver or transceiver;*
>
> *a tuner associated with said at least one multiband transmitter, receiver, or transceiver; and*
>
> *a controller for controlling tuning of the tuner to a plurality of different bands,*

*wherein at least one antenna of said one or more antennas is used by said at least one multiband transmitter, receiver or transceiver in a plurality of different bands,*

*wherein said at least one antenna is one or more of*

*a) an actively tuned antenna, and*

*b) is tuned by one or more passive elements which are selected or interconnected using electronic control.*

*Id.* at col. 10:49-62.

97. The ’763 and ’358 Patents also describe and claim shared multiband antenna arrangements in which connected receiver, transmitter, or transceiver components operate in different frequency bands, including simultaneously. *See, e.g.*, Ex. 7, ’763 Patent at claim 13; Ex. 8, ’358 Patent at claim 19. Claim 13 of the ’763 Patent recites alternatives involving either one component operating simultaneously at two or more frequency bands or two or more components operating simultaneously at two or more frequency bands. Claim 19 of the ’358 Patent additionally recites antennas that include elements or sub-elements and that form an antenna array. Claim 13 of the ’763 Patent and claim 19 of the ’358 Patent each recite, as a first alternative, that at least one component transmits or receives simultaneously in two or more frequency bands and, as a second alternative, that two or more components transmit or receive in two or more frequency bands. Claim 13 of the ’763 Patent also expressly recites simultaneous operation in the second alternative. Claim 13 of the ’763 Patent and Claim 19 of the ’358 Patent do not require an antenna tuner or electronically controlled impedance adjustment. The shared multiband antenna arrangements disclosed in the ’763 and ’358 Patents are relevant to portable wireless devices supporting cellular, Wi-Fi and Bluetooth communications.

98. The ’763 and ’358 Patents provide a novel solution to the engineering challenge of supporting an increasing number of wireless frequency bands within compact consumer electronics by enabling a shared antenna structure to serve radio circuitry operating in multiple

bands, including simultaneously. The disclosed approaches in the ’763 and ’358 Patents include controlled tuning arrangements and shared multiband antenna arrangements to support connected radio components that operate across different frequency bands. Using shared antenna structures can reduce the need for separate band-specific antennas and associated connections and reduce antenna-design complexity and manufacturing cost.

99. The ’763 and ’358 Patents recite concrete radio and antenna arrangements. The recited concrete arrangements include the controlled-tuning architecture exemplified by claim 6 of the ’763 Patent and the shared multiband antenna architectures exemplified by claim 13 of the ’763 Patent and claim 19 of the ’358 Patent. Claim 13 of the ’763 Patent and claim 19 of the ’358 Patent specify relationships between multiband antennas and the connected receiver, transmitter, or transceiver components, including specifying multiband operating alternatives; claim 19 of the ’358 Patent additionally recites an antenna array comprising elements or sub-elements.

100. The architectures disclosed and claimed in the ’763 and ’358 Patents address how radio circuitry uses antenna structures across different operating bands. In controlled-tuning implementations, the tuning circuitry configures the radio-to-antenna connection for operation in different frequency bands and can improve signal-power transfer from the transmitter to the antenna during transmission and from the antenna to the receiver during reception. In shared multiband antenna implementations, connected radio components use a common antenna across different frequency bands, including during simultaneous operation, such as transmitting in multiple bands, receiving in multiple bands, or transmitting in one band while receiving in another. Reducing the need for separate antenna structures and associated connections can streamline device design and manufacturing and also decrease material costs.

101. The ’625 and ’548 Patents build on the antenna and radio-circuitry disclosed in the

’763 and ’358 Patents and add technologies for using sensor information to control the radiation pattern of a steerable antenna. The devices disclosed in the ’625 and ’548 Patents use sensors to determine the device’s orientation relative to a user or structure, identify corresponding zones or spans of directions, and adjust the antenna’s radiation pattern to avoid directing radiation into those zones or directions. The sensor-based steering described in the ’625 and ’548 Patents can reduce attenuation or interference caused by the user or another structure while also directing radiation away from the user. The device can maintain a usable beam in other directions and update its radiation pattern as the sensed conditions change. The technology claimed in the ’625 and ’548 Patents is particularly useful at mmWave and upper mid-band frequencies, which fall within the claimed range of the ’625 and ’548 Patents of 10 GHz to 500 GHz, because mmWave and upper mid-band signals can be substantially attenuated or blocked by a user’s body or other intervening objects. Using sensor information to identify and avoid obstructed directions can therefore help maintain a usable wireless link while directing radiation away from the user.

102. The ’625 and ’548 Patents claim priority to a continuation-in-part application (Serial No. 13/966,853), filed on August 14, 2013.

103. The ’625 and ’548 Patents explain that it is “useful to steer radiation energy of a portable or fixed device away from” an obstacle, such as a person’s head or body, or a building, because the obstacle may “attenuate or interfere with an intended radiation signal of such a device.” Ex. 9, ’625 Patent at col. 10:46-52.

104. The ’625 and ’548 Patents describe how a sensor (or sensors) of the mobile device with the steerable antenna can be used to help detect an orientation of the obstacle relative to the mobile device. *See id.* at col. 11:52-56, col. 12:4-13:3. Based on this information, beamforming or beamsteering algorithms can determine an appropriate radiation pattern for the antenna so that

the radiation pattern from the antenna is directed away from the obstacle. *Id.* at col. 12:8-11, col. 13:4-8. Furthermore, the antenna can be adjusted to radiate the energy in one or more desired directions. *Id.* at col. 11:65-12:3, col. 13:35-45.

105. The ’625 and ’548 Patents further describe how the steerable antenna could be implemented with an antenna array, including for a MIMO antenna system. *See id.* at col. 14:32-36.

106. Claim 1 of the ’625 Patent recites a method for configuring a wireless device with such a steerable antenna, stating:

> *1. A method for avoiding radiation of a user or structure by a wireless device having at least one steerable antenna, comprising the steps of:*
>
> *detecting in a three dimensional space, using one or more cameras, microphones, audio sensors, ultrasound sensors or transducers, range finders, capacitive sensors, gyroscopes, light detectors, or motion detectors, an orientation of said wireless device relative to either or both said user and said structure;*
>
> *determining zones or spans of directions in the three dimensional space corresponding with one or more directions of either or both said user and said structure relative to said at least one steerable antenna; and*
>
> *adjusting one or more beam radiation patterns of said at least one steerable antenna to radiate in one or more directions which are not in said zones or spans of directions in the three dimensional space, wherein said at least one steerable antenna is configured to steer or direct its energy in particular directions while providing nulls or dead zones in other directions, and wherein said adjusting step adjusts the one or more beam radiation patterns for direction of energy to one or more of said particular directions while avoiding said zones or spans of directions in the three dimensional space, and wherein said at least one steerable antenna operates on one or multiple bands and radiates at one or more frequencies in the range of 10 GHz to 500 GHz.*

*Id.* at col. 14:55-15:15.

107. The above claim, as well as other claims of the ’625 and ’548 Patents, recite that the steerable antenna “radiates at one or more frequencies in the range of 10 GHz to 500 GHz.” *Id.*; *see also id.* at claims 11 and 23; Ex. 10, ’548 Patent at claims 1, 7, and 12. This frequency range encompasses upper mid-band and millimeter-wave (mmWave) spectrum, including the

12.7-13.25 GHz, 24 GHz, 28 GHz and 39 GHz bands.

108. Beam steering is especially important for the mmWave bands of 5G cellular because radio transmissions at those bands are more easily attenuated by objects, which can lead to shorter coverage range.

109. The mmWave bands of 5G operate at frequencies in the range of 10 GHz to 500 GHz.

110. The n258 band of 5G NR operates at about 24 GHz.

111. The n261 band of 5G NR operates at about 28 GHz.

112. Verizon uses the n260 and n261 bands for 5G NR millimeter-wave service in the United States.

113. Apple's iPhone 16 Pro (model A3083) supports n260 and n261 bands, and the iPhone 16 Pro (model A3083) can use Verizon's 5G Ultra Wideband service.

114. The '625 and '548 Patents address technical problems arising when a wireless device directs antenna radiation toward a user or obstructing structure. The claimed inventions use sensor information to determine the device's orientation relative to the user or structure, identify corresponding zones or spans of directions in three-dimensional space, and adjust a steerable antenna's radiation pattern to avoid or attenuate radiation in the zones or spans of direction identified as a user or obstructing structure. The coordinated sensing and antenna control described in the '625 and '548 Patents can reduce obstruction-related attenuation or interference by directing radiation away from the user and maintaining a usable beam elsewhere.

115. The claims of the '625 and '548 Patents recite specific combinations of sensing, spatial determination, and antenna control functionality, rather than merely claiming the desired result of improved wireless communication. The combinations claimed in the '625 and '548

Patents link sensor-derived information about the device's orientation relative to a user or structure with the determination of zones or directions to adjust the radiation pattern of a steerable antenna at one or more frequencies within the range of 10 GHz to 500 GHz.

116. The inventions of the '625 and '548 Patents address the degradation of high-frequency wireless links caused when a user's body or another structure attenuates or interferes with the intended signal, a problem particularly significant at mmWave and upper mid-band frequencies encompassed by the claimed 10 GHz to 500 GHz range. The systems disclosed in the '625 and '548 Patents can repeat the sensing, direction-determination, and radiation-pattern adjustments as conditions change, including as the device moves or when the user changes how the device is held. The claimed systems of the '625 and '548 Patents provide a concrete improvement in device operation: the systems adapt the antenna's physical radiation pattern to the sensed environment to help preserve a usable wireless link while avoiding or reducing radiation toward the user or structure.

**iii. The '925 Patent**

117. The '925 Patent describes novel and comprehensive methods and systems, running across both central servers and end-user mobile devices, for dynamic, location-aware management of wireless communication infrastructure and services. The systems disclosed in the '925 Patent monitor radio operating conditions of wireless devices and use the monitored conditions to update location-specific network performance or service-quality information in a computerized database. The database can also maintain records concerning network infrastructure, end-user devices and assets, or geographic locations. Electronic interfaces support updating and accessing the information maintained in the database and sending instructions to wireless devices to configure or reconfigure the wireless device's operating parameters based on performance rankings,

enhanced spectrum usage, interference control, or end-user requests. Thus, the inventions of the ’925 Patent disclose a combination of monitoring wireless devices and network conditions across geographic locations and providing responsive configurations to the wireless device. The combination of monitoring operating conditions of wireless devices and providing configurations to wireless devices in response to those conditions can improve wireless performance and resource efficiency and support remote monitoring and management of wireless devices.

118. The ’925 Patent claims priority to three provisional applications: (i) Serial No. 60/971,175, filed on September 10, 2007; (ii) Serial No. 60/977,582, filed on October 4, 2007; and (iii) Serial No. 61/028,261, filed on February 13, 2008.

119. In the 2007-2008 timeframe, wireless network operators, service providers, and enterprises generally lacked direct, scalable, and real-time visibility into the conditions under which end users experienced wireless connectivity—such as signal strength, quality of service, device configuration, and infrastructure availability—particularly across diverse geographic locations. Existing network planning and monitoring approaches relied heavily on static models, isolated test equipment, or costly consultants, and did not leverage the wealth of contextual data available from end-user devices themselves. These limitations hindered the ability to configure or reconfigure wireless devices in response to the actual radio conditions and available communications services at particular locations, including to improve connectivity, to control interference, or to conserve battery power.

120. The ’925 Patent addresses the foregoing problems by introducing methods and systems that combine monitoring radio operating conditions of wireless devices, updating location-specific performance or service-quality information in a computerized database, and providing responsive configuration or reconfiguration settings to wireless devices through

electronic interfaces. Monitoring applications obtain radio operating conditions from wireless devices and use those conditions to update the database, making information about the wireless environment at particular locations available to support device operation. The systems claimed in the '925 Patent can send instructions through the electronic interfaces to configure or reconfigure wireless devices based on performance rankings, enhanced spectrum usage, interference control, or end-user requests. For example, the systems disclosed in the '925 Patent can support changes to operating frequencies, air interfaces, or other operating parameters to improve connectivity and conserve battery power. By linking radio-condition monitoring and database updates with responsive device configuration, the inventions of the '925 Patent provide a scalable framework for improving wireless-device and network operation across geographic locations.

121. Claims 12 and 14 of the '925 Patent illustrate a system architecture that combines monitoring the radio operating condition of wireless devices and updating location-specific performance or service-quality information with instructions to configure or reconfigure wireless devices based on performance rankings, enhanced spectrum usage, interference control, or end-user requests. Claim 12 recites:

> *12. A clearinghouse system for communications networks, comprising:*
>
> *one or more computers which interface with a database, said database including performance, quality of service, or perceived telecommunications service quality or value information, experienced or desired, for one or more mobile or fixed devices or end users for one or more geographic locations of said one or more mobile or fixed devices or end users, and one or more of*
>
>> *records pertaining to one or more telecommunications carriers which identify one or more of infrastructure, type, and/or location information for one or more locations,*
>>
>> *records for one or more end users which identify one or more of equipment, devices, telecommunications assets, and property assets owned, controlled or used by said one or more end users, and*
>>
>> *public records which include, for a plurality of geographic locations, one or more of: addresses, maps, location coordinates, or mapping information for said geographic locations, zoning information for said geographic locations, local*

> *ordinances for said geographic locations, contact information for government officials for said geographic locations, and information about one or more carriers serving said geographic locations; and*
>
> *one or more electronic interfaces to said one or more computers which permit performance, quality of service, or perceived communications service quality or value information, experienced or desired, obtained for one or more mobile or fixed devices that are located in one of said one or more geographic locations to be automatically or manually updated into said database, and which permit at least one of said one or more telecommunications carriers or one or more of said end users or one or more parties which are not telecommunications carriers or end users to review, catalog, store, view, sort, or use said performance, quality of service, or perceived communications service quality or value information, experienced or desired, in said database; and*
>
> *a monitoring application which permits monitoring of radio operating conditions for one or more mobile or fixed wireless devices, wherein monitored radio operating conditions are used to update performance or quality of service information or perceived communications quality or service value in said database,*
>
> *wherein said performance or quality of service information or perceived communications quality or service value includes information from one or more bands, one or more carriers, one or more mobile or fixed devices, or one or more end users from one or more bands or carriers.*

*See* Ex. 11, '925 Patent at col. 38:19-39:3.

Claim 14 depends from claim 12 and recites:

> *14. The clearinghouse system of claim 12 further comprising means for sending instructions from one of said one or more electronic interfaces to one or more wireless devices for configuring or reconfiguring said one or more wireless devices based on one or more of: a ranking of performance, enhanced spectrum usage, control of interference, or requests of an end user.*

*See id.* at 39:9-15.

122. The '925 Patent addresses the technical problem of adapting the operation of wireless devices to radio conditions and the availability of communication services that vary across geographic locations and over time. Rather than relying solely on static network models or isolated measurements, the systems disclosed in the '925 Patent obtain location-specific radio operating and performance information from wireless devices, update that information in a computerized database, and support responsive changes to the operating parameters of the wireless devices. For example, the systems disclosed in the '925 Patent can support selection of operating frequencies,

air interfaces, power levels, or data rates suited to the wireless conditions at a particular location. The capabilities enabled by the inventions of the ’925 Patent can improve connectivity, control interference, enhance spectrum usage, and reduce unnecessary battery consumption by enabling device operation to account for the wireless environment in which the device is used.

123. The claimed architecture exemplified by claim 14 of the ’925 Patent combines computers interfacing with a database that contains location-specific performance or service-quality information together with one or more categories of records concerning telecommunications carriers, end-user equipment or assets, or public records associated with geographic locations; electronic interfaces permitting that information to be updated and accessed; a monitoring application that uses monitored radio operating conditions to update the database; and a means for sending instructions through an electronic interface to configure or reconfigure wireless devices based on performance rankings, enhanced spectrum usage, interference control, or end-user requests. In the 2007-2008 timeframe, the combination of monitoring radio conditions, updating the database with location specific conditions, and configuring or reconfiguring wireless devices based on the monitored and updated conditions was not a well-understood, routine, or conventional arrangement. The improvements provided by the ’925 Patent reside in the coordinated operation of these components, rather than merely in using a computer to collect, organize, or display information.

124. The specification of the ’925 Patent describes how the system can implement responsive device configuration through communications between a server and a wireless device. In the procedure illustrated in Figure 12, the device and server perform a handshake through which the device is identified, the server sends information to the identified device, and the device uses that information to tune to an appropriate operating band or service provider or to operate with

reduced power drain. Rankings of available services or operating modes can be maintained at the device and updated as its location changes. The specification of the ’925 Patent also describes autonomous communications in a low-level format loaded into device memory, without requiring the user to interpret the transmitted information. These implementations provide concrete improvements in operation of wireless devices by enabling operating settings to respond to location-specific wireless conditions, rather than merely presenting network information for a person to review.

125. The monitoring and configuration operations disclosed by the ’925 Patent can occur autonomously, without requiring an end user to observe radio conditions, enter measurements, interpret network performance reports, or manually select new operating settings. Wireless devices can associate radio measurements with geographic locations and upload that information for inclusion in the database, while information transmitted to an identified device can be used to adjust the operation of the wireless device. Through the machine-to-machine communications disclosed in the ’925 Patent, the system claimed in the ’925 Patent can respond to conditions encountered by wireless devices during their use, rather than merely furnishing reports or recommendations for human consideration.

126. The specification of the ’925 Patent distinguishes existing tools that mapped tower locations, displayed Wi-Fi hotspot locations, or collected customer comments about reception from the monitoring and control architecture disclosed in the ’925 Patent. The location or reception information provided by those existing tools did not combine monitoring wireless-device radio conditions, updating location-specific performance or service-quality information, and sending instructions for responsive wireless-device configuration. The technical improvement enabled by the ’925 Patent concerns using wireless-condition information to support responsive configuration

of wireless devices, not merely the availability of a map, database, or online report.

### C. The Accused Products and Apple's Infringement

#### i. Wireless Relay Devices and Laptops

127. A wireless relay receives signals or data over one connection and retransmits the information over another connection, at least one of which is wireless, which enables communications between devices or networks. A wireless relay can connect devices onto networks using different communications technologies, such as by receiving data over a cellular, satellite or wired connection and retransmitting that data over a Wi-Fi connection to another device, and vice versa. In this manner, a wireless relay can enable a connected device to access the internet through the relay's network connection, even when the connected device lacks direct access to that network.

128. Apple makes, has made, uses, sells, offers to sell, and/or distributes in the United States, and/or imports into the United States, devices that can operate as a wireless relay, where the device is operable using channels with a bandwidth of 100 MHz or more and/or data rates of 100 Mbps or more ("Accused Wireless Relay Devices"), including but not limited to the following products: (i) smartphones, such as but not limited to the iPhone XR (A1984); iPhone 11 (A2111); iPhone 11 Pro (A2160); iPhone 11 Pro Max (A2161); iPhone SE (2nd generation) (A2275); iPhone 12 mini (A2176); iPhone 12 (A2172); iPhone 12 Pro (A2341); iPhone 12 Pro Max (A2342); iPhone 13 mini (A2481); iPhone 13 (A2482); iPhone 13 Pro (A2483); iPhone 13 Pro Max (A2484); iPhone SE (3rd generation) (A2595); iPhone 14 (A2649); iPhone 14 Plus (A2632); iPhone 14 Pro (A2650); iPhone 14 Pro Max (A2651); iPhone 15 (A2846); iPhone 15 Plus (A2847); iPhone 15 Pro (A2848); iPhone 15 Pro Max (A2849); iPhone 16 (A3081); iPhone 16 Plus (A3082); iPhone 16 Pro (A3083); iPhone 16 Pro Max (A3084); iPhone 16e (A3212); iPhone 17 (A3258);

iPhone Air (A3260); iPhone 17 Pro (A3256); iPhone 17 Pro Max (A3257); iPhone 17e (A3575); iPhone 18 Pro (A3472); iPhone 18 Pro Max (A3473); iPhone Duo (A3447) model smartphones; and (ii) tablets, such as but not limited to the iPad (8th generation) 10.2-inch (A2428); iPad (9th generation) 10.2-inch (A2604); iPad (10th generation) 10.9-inch (A2757); iPad (A16) 11-inch (11th generation) (A3355); iPad mini (5th generation) (A2124); iPad mini (6th generation) (A2568); iPad mini (A17 Pro) (7th generation) (A2995); iPad Air (4th generation) (A2324); iPad Air (5th generation) (A2589); iPad Air 11-inch (M2) (A2903); iPad Air 13-inch (M2) (A2899); iPad Air 11-inch (M3) (A3267); iPad Air 13-inch (M3) (A3269); iPad Air 11-inch (M4) (A3460); iPad Air 13-inch (M4) (A3462); iPad Pro 11-inch (2nd generation) (A2068); iPad Pro 12.9-inch (4th generation) (A2069); iPad Pro 11-inch (3rd generation) (A2301); iPad Pro 12.9-inch (5th generation) (A2379); iPad Pro 11-inch (4th generation) (A2435); iPad Pro 12.9-inch (6th generation) (A2764); iPad Pro 11-inch (M4) (A2837); iPad Pro 13-inch (M4) (A2926); iPad Pro 11-inch (M5) (A3358); iPad Pro 13-inch (M5) (A3361) model tablets.

129. The Accused Wireless Relay Devices are configurable to operate as wireless relays to connect a connected device via a Wi-Fi network to the Internet via a cellular or wired network. The Accused Wireless Relay Devices use Wi-Fi and/or cellular wireless connections with channels with bandwidths of 100 MHz or more and/or data rates of 100 Mbps or more.

130. The Accused Wireless Relay Devices are configurable to operate as wireless relays or repeaters to connect a connected device, using, for example, a Wi-Fi 5 (IEEE 802.11ac), Wi-Fi 6 (IEEE 802.11ax), Wi-Fi 6E (IEEE 802.11ax), and/or Wi-Fi 7 (IEEE 802.11be) network, to the Internet backbone via a 4G LTE or a 5G cellular network, or via a wired connection.

131. Wi-Fi 5, Wi-Fi 6, Wi-Fi 6E, and Wi-Fi 7 all support channels with bandwidths of 100 MHz or more.

132. Wi-Fi 5, Wi-Fi 6, Wi-Fi 6E, and Wi-Fi 7 all support channels with bandwidths of 160 MHz.

133. The 160 MHz channels of Wi-Fi 5, Wi-Fi 6, and Wi-Fi 6E support data rates of 100 Mbps or more.

134. Some implementations of Wi-Fi also support channels with bandwidths of 320 MHz.

135. The 320 MHz channels of Wi-Fi 7 support data rates of 100 Mbps or more.

136. One or more wireless telecommunication carriers in the United States support 4G LTE and 5G cellular networks, for use by the Accused Wireless Relay Devices.

137. A 4G LTE-Advanced cellular network can aggregate up to five component carriers ("CCs"), each with a bandwidth of up to 20 MHz, resulting in a total aggregated bandwidth of up to 100 MHz.

138. 4G LTE CCs can be aggregated intra-band to achieve an aggregated bandwidth of 100 MHz or more.

139. 4G LTE Band 41 supports up to five 20 MHz carriers that can be aggregated to achieve an aggregated bandwidth of 100 MHz or more.

140. One or more wireless telecommunication carriers have used and/or currently use 4G LTE Band 41 in the United States.

141. Aggregated 4G LTE channels can support data rates of 100 Mbps or more.

142. 5G cellular includes bands with bandwidths of 100 MHz or more and data rates of 100 Mbps or more.

143. 5G cellular bands that have bandwidths of 100 MHz or more include, but are not limited to, n41, n48, n77, n260, and n261.

144. One or more wireless telecommunication carriers in the United States support the n41, n48, n77, n260, and n261 5G bands.

145. Cellular 5G network bands, including n41, n48, n77, n260, and n261, can achieve data rates of 100 Mbps or more.

146. Each of the following Apple smartphone models includes multiple antennas configured for MIMO communications: iPhone 12 mini (A2176); iPhone 12 (A2172); iPhone 12 Pro (A2341); iPhone 12 Pro Max (A2342); iPhone 13 mini (A2481); iPhone 13 (A2482); iPhone 13 Pro (A2483); iPhone 13 Pro Max (A2484); iPhone SE (3rd generation) (A2595); iPhone 14 (A2649); iPhone 14 Plus (A2632); iPhone 14 Pro (A2650); iPhone 14 Pro Max (A2651); iPhone 15 (A2846); iPhone 15 Plus (A2847); iPhone 15 Pro (A2848); iPhone 15 Pro Max (A2849); iPhone 16 (A3081); iPhone 16 Plus (A3082); iPhone 16 Pro (A3083); iPhone 16 Pro Max (A3084); iPhone 16e (A3212); iPhone 17 (A3258); iPhone Air (A3260); iPhone 17 Pro (A3256); iPhone 17 Pro Max (A3257); iPhone 17e (A3575); iPhone 18 Pro (A3472); iPhone 18 Pro Max (A3473); iPhone Duo (A3447) model smartphones. Each of the following Apple tablet models likewise includes multiple antennas configured for MIMO communications: iPad (8th generation) 10.2-inch (A2428); iPad (9th generation) 10.2-inch (A2604); iPad (10th generation) 10.9-inch (A2757); iPad (A16) 11-inch (11th generation) (A3355); iPad mini (5th generation) (A2124); iPad mini (6th generation) (A2568); iPad mini (A17 Pro) (7th generation) (A2995); iPad Air (4th generation) (A2324); iPad Air (5th generation) (A2589); iPad Air 11-inch (M2) (A2903); iPad Air 13-inch (M2) (A2899); iPad Air 11-inch (M3) (A3267); iPad Air 13-inch (M3) (A3269); iPad Air 11-inch (M4) (A3460); iPad Air 13-inch (M4) (A3462); iPad Pro 11-inch (2nd generation) (A2068); iPad Pro 12.9-inch (4th generation) (A2069); iPad Pro 11-inch (3rd generation) (A2301); iPad Pro 12.9-inch (5th generation) (A2379); iPad Pro 11-inch (4th generation) (A2435); iPad Pro 12.9-inch (6th

generation) (A2764); iPad Pro 11-inch (M4) (A2837); iPad Pro 13-inch (M4) (A2926); iPad Pro 11-inch (M5) (A3358); iPad Pro 13-inch (M5) (A3361) model tablets.

147. Each of the following Apple smartphone models transmits Wi-Fi beacon frames when operating as a Personal Hotspot: iPhone 12 mini (A2176); iPhone 12 (A2172); iPhone 12 Pro (A2341); iPhone 12 Pro Max (A2342); iPhone 13 mini (A2481); iPhone 13 (A2482); iPhone 13 Pro (A2483); iPhone 13 Pro Max (A2484); iPhone SE (3rd generation) (A2595); iPhone 14 (A2649); iPhone 14 Plus (A2632); iPhone 14 Pro (A2650); iPhone 14 Pro Max (A2651); iPhone 15 (A2846); iPhone 15 Plus (A2847); iPhone 15 Pro (A2848); iPhone 15 Pro Max (A2849); iPhone 16 (A3081); iPhone 16 Plus (A3082); iPhone 16 Pro (A3083); iPhone 16 Pro Max (A3084); iPhone 16e (A3212); iPhone 17 (A3258); iPhone Air (A3260); iPhone 17 Pro (A3256); iPhone 17 Pro Max (A3257); iPhone 17e (A3575); iPhone 18 Pro (A3472); iPhone 18 Pro Max (A3473); iPhone Duo (A3447) model smartphones. Each of the following Apple tablet models likewise transmits Wi-Fi beacon frames when operating as a Personal Hotspot: iPad (8th generation) 10.2-inch (A2428); iPad (9th generation) 10.2-inch (A2604); iPad (10th generation) 10.9-inch (A2757); iPad (A16) 11-inch (11th generation) (A3355); iPad mini (5th generation) (A2124); iPad mini (6th generation) (A2568); iPad mini (A17 Pro) (7th generation) (A2995); iPad Air (4th generation) (A2324); iPad Air (5th generation) (A2589); iPad Air 11-inch (M2) (A2903); iPad Air 13-inch (M2) (A2899); iPad Air 11-inch (M3) (A3267); iPad Air 13-inch (M3) (A3269); iPad Air 11-inch (M4) (A3460); iPad Air 13-inch (M4) (A3462); iPad Pro 11-inch (2nd generation) (A2068); iPad Pro 12.9-inch (4th generation) (A2069); iPad Pro 11-inch (3rd generation) (A2301); iPad Pro 12.9-inch (5th generation) (A2379); iPad Pro 11-inch (4th generation) (A2435); iPad Pro 12.9-inch (6th generation) (A2764); iPad Pro 11-inch (M4) (A2837); iPad Pro 13-inch (M4) (A2926); iPad Pro 11-inch (M5) (A3358); iPad Pro 13-inch (M5) (A3361) model tablets.

148. Apple provides instructions to customers to configure and use Accused Wireless Relay Devices, including but not limited to iPhones and iPads, in a manner that infringes the Intelligent Wireless Broadband Relay Patents through customer-facing documentation like user guides on the support pages of Apple's website.[38]

149. User guides from Apple for Accused Wireless Relay Devices provide instructions to Apple's customers on how to configure an Accused Wireless Relay Device to operate as a hotspot, where the hotspot employs a wireless channel with a bandwidth of 100 MHz or more.[39]

150. A user of Accused Wireless Relay Devices can follow the instructions provided by Apple in its user guides to configure the Accused Wireless Relay Devices to operate in a manner that infringes the Intelligent Wireless Broadband Relay Patents, including but not limited to the iPhone 12 mini (A2176); iPhone 12 (A2172); iPhone 12 Pro (A2341); iPhone 12 Pro Max (A2342); iPhone 13 mini (A2481); iPhone 13 (A2482); iPhone 13 Pro (A2483); iPhone 13 Pro Max (A2484); iPhone SE (3rd generation) (A2595); iPhone 14 (A2649); iPhone 14 Plus (A2632); iPhone 14 Pro (A2650); iPhone 14 Pro Max (A2651); iPhone 15 (A2846); iPhone 15 Plus (A2847); iPhone 15 Pro (A2848); iPhone 15 Pro Max (A2849); iPhone 16 (A3081); iPhone 16 Plus (A3082); iPhone 16 Pro (A3083); iPhone 16 Pro Max (A3084); iPhone 16e (A3212); iPhone 17 (A3258); iPhone Air (A3260); iPhone 17 Pro (A3256); iPhone 17 Pro Max (A3257); iPhone 17e (A3575); iPhone 18 Pro (A3472); iPhone 18 Pro Max (A3473); iPhone Duo (A3447) model smartphones and the iPad (8th generation) 10.2-inch (A2428); iPad (9th generation) 10.2-inch (A2604); iPad (10th generation) 10.9-inch (A2757); iPad (A16) 11-inch (11th generation) (A3355); iPad mini

---

[38] *See, e.g.*, *iPhone User Guide, Share your internet connection from your iPhone*, https://support.apple.com/guide/iphone/share-your-internet-connection-iph45447ca6/26/ios/26 (last visited Nov. 3, 2026).

[39] *See id.*

(5th generation) (A2124); iPad mini (6th generation) (A2568); iPad mini (A17 Pro) (7th generation) (A2995); iPad Air (4th generation) (A2324); iPad Air (5th generation) (A2589); iPad Air 11-inch (M2) (A2903); iPad Air 13-inch (M2) (A2899); iPad Air 11-inch (M3) (A3267); iPad Air 13-inch (M3) (A3269); iPad Air 11-inch (M4) (A3460); iPad Air 13-inch (M4) (A3462); iPad Pro 11-inch (2nd generation) (A2068); iPad Pro 12.9-inch (4th generation) (A2069); iPad Pro 11-inch (3rd generation) (A2301); iPad Pro 12.9-inch (5th generation) (A2379); iPad Pro 11-inch (4th generation) (A2435); iPad Pro 12.9-inch (6th generation) (A2764); iPad Pro 11-inch (M4) (A2837); iPad Pro 13-inch (M4) (A2926); iPad Pro 11-inch (M5) (A3358); iPad Pro 13-inch (M5) (A3361) model tablets.[40]

151. A user of Accused Wireless Relay Devices can follow the instructions provided by Apple in its user guides to configure the Accused Wireless Relay Devices to operate as a wireless relay for wireless channels with a bandwidth of 100 MHz or more, including but not limited to the iPhone 12 mini (A2176); iPhone 12 (A2172); iPhone 12 Pro (A2341); iPhone 12 Pro Max (A2342); iPhone 13 mini (A2481); iPhone 13 (A2482); iPhone 13 Pro (A2483); iPhone 13 Pro Max (A2484); iPhone SE (3rd generation) (A2595); iPhone 14 (A2649); iPhone 14 Plus (A2632); iPhone 14 Pro (A2650); iPhone 14 Pro Max (A2651); iPhone 15 (A2846); iPhone 15 Plus (A2847); iPhone 15 Pro (A2848); iPhone 15 Pro Max (A2849); iPhone 16 (A3081); iPhone 16 Plus (A3082); iPhone 16 Pro (A3083); iPhone 16 Pro Max (A3084); iPhone 16e (A3212); iPhone 17 (A3258); iPhone Air (A3260); iPhone 17 Pro (A3256); iPhone 17 Pro Max (A3257); iPhone 17e (A3575); iPhone 18 Pro (A3472); iPhone 18 Pro Max (A3473); iPhone Duo (A3447) model smartphones and the iPad (8th generation) 10.2-inch (A2428); iPad (9th generation) 10.2-inch (A2604); iPad (10th generation) 10.9-inch (A2757); iPad (A16) 11-inch (11th generation) (A3355); iPad mini

---

[40] *See id.*

(5th generation) (A2124); iPad mini (6th generation) (A2568); iPad mini (A17 Pro) (7th generation) (A2995); iPad Air (4th generation) (A2324); iPad Air (5th generation) (A2589); iPad Air 11-inch (M2) (A2903); iPad Air 13-inch (M2) (A2899); iPad Air 11-inch (M3) (A3267); iPad Air 13-inch (M3) (A3269); iPad Air 11-inch (M4) (A3460); iPad Air 13-inch (M4) (A3462); iPad Pro 11-inch (2nd generation) (A2068); iPad Pro 12.9-inch (4th generation) (A2069); iPad Pro 11-inch (3rd generation) (A2301); iPad Pro 12.9-inch (5th generation) (A2379); iPad Pro 11-inch (4th generation) (A2435); iPad Pro 12.9-inch (6th generation) (A2764); iPad Pro 11-inch (M4) (A2837); iPad Pro 13-inch (M4) (A2926); iPad Pro 11-inch (M5) (A3358); iPad Pro 13-inch (M5) (A3361) model tablets.[41]

152. The Accused Wireless Relay Devices infringe at least one claim of each of the Intelligent Wireless Broadband Relay Patents. Upon information and belief, the other Accused Wireless Relay Devices include structures and perform functions that likewise satisfy the claim limitations of the ’194, ’812, ’754, ’337, ’999, and ’783 Patents.

153. Upon information and belief, Apple also makes, has made, uses, sells, offers to sell, and/or distributes in the United States, and/or imports into the United States, laptop computers that can operate as a wireless relay, where the laptop computer is operable as a Wi-Fi access point providing Wi-Fi channels with a bandwidth of 100 MHz or more and/or data rates of 100 Mbps or more (“Accused Wireless Relay Laptops”), including but not limited to the following laptops: MacBook Air 13-inch (M5, 2026), MacBook Air 15-inch (M5, 2026), MacBook Pro 14-inch (M6, 2026), MacBook Pro 16-inch (M6, 2026), MacBook Neo 13-inch (2026), MacBook Air 13-inch (M4, 2025), MacBook Air 15-inch (M4, 2025), MacBook Pro 14-inch (M5, 2025), MacBook Pro 16-inch (M5, 2025), MacBook Air 13-inch (M3, 2024), MacBook Air 15-inch (M3, 2024),

[41] *See id.*

MacBook Pro 14-inch (M4 / M4 Pro / M4 Max, 2024), MacBook Pro 16-inch (M4 Pro / M4 Max, 2024), MacBook Pro 14-inch (M3 / M3 Pro / M3 Max, Late 2023), MacBook Pro 16-inch (M3 Pro / M3 Max, Late 2023), MacBook Air 15-inch (M2, 2023), MacBook Pro 14-inch (M2 Pro / M2 Max, Early 2023), MacBook Pro 16-inch (M2 Pro / M2 Max, Early 2023), MacBook Air 13-inch (M2, 2022), MacBook Pro 13-inch (M2, 2022), MacBook Pro 14-inch (M1 Pro / M1 Max, 2021), MacBook Pro 16-inch (M1 Pro / M1 Max, 2021), MacBook Air 13-inch (M1, 2020), MacBook Pro 13-inch (M1, 2020), MacBook Air 13-inch (Intel, 2020), MacBook Pro 13-inch (Intel, 2020), MacBook Pro 16-inch (Intel, 2019), MacBook Air 13-inch (Intel, 2019), MacBook Pro 13-inch (Intel, 2019), MacBook Pro 15-inch (Intel, 2019), MacBook Air 13-inch (Intel, 2018), MacBook Pro 13-inch (Intel, 2018), MacBook Pro 15-inch (Intel, 2018), MacBook (12-inch, 2017), MacBook Air 13-inch (Intel, 2017), MacBook Pro 13-inch (Intel, 2017), MacBook Pro 15-inch (Intel, 2017), MacBook (12-inch, 2016).

154. The Accused Wireless Relay Laptops are configurable to operate as wireless relays to connect a connected device via a Wi-Fi network to the Internet via, for example, Ethernet. Upon information and belief, the Accused Wireless Relay Laptops, when operating in an Internet Sharing mode, use Wi-Fi wireless connections with channels with bandwidths of 100 MHz or more and/or data rates of 100 Mbps or more.

155. The Accused Wireless Relay Laptops are configurable to operate as wireless relays to connect a connected device to the Internet backbone via Ethernet, using, for example, a Wi-Fi 5 (IEEE 802.11ac), Wi-Fi 6 (IEEE 802.11ax), Wi-Fi 6E (IEEE 802.11ax), and/or Wi-Fi 7 (IEEE 802.11be) network.

156. Apple provides user guides on its support website instructing customers how to configure and use the Accused Wireless Relay Laptops in a manner that infringes the ’194, ’812, ’754, and ’337 Patents.

157. User guides from Apple for the Accused Wireless Relay Laptops provide instructions to Apple’s customers on how to configure an Accused Wireless Relay Laptop to operate in an Internet Sharing mode as an access point, where the Accused Wireless Relay Laptop employs a wireless channel with a bandwidth of 100 MHz or more.

158. A user of the Accused Wireless Relay Laptops can follow the instructions provided by Apple in its user guides to configure the Accused Wireless Relay Laptops to operate in a manner that infringes the ’194, ’812, ’754, and ’337 Patents.

159. A user of the Accused Wireless Relay Laptops can follow the instructions provided by Apple in its user guides to configure the Accused Wireless Relay Laptops to operate as a wireless relay for a wireless channel with a bandwidth of 100 MHz or more.

160. The Accused Wireless Relay Laptops infringe at least one claim of each of the ’194, ’812, ’754, and ’337 Patents.

161. Users of the Accused Wireless Relay Devices and Accused Wireless Relay Laptops include customers that purchase an Accused Wireless Relay Device or Accused Wireless Relay Laptop, as the case may be, for personal use.

162. Apple provides instructions on how to configure the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops as wireless relays.

163. Users of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops can configure their Accused Wireless Relay Devices and Accused Wireless Relay Laptops, as the case may be, to operate as a wireless relay according to the instructions in the user

manual corresponding to the Accused Wireless Relay Device and Accused Wireless Relay Laptop, as the case may be.

164. Apple promotes the use of Personal Hotspot through its support materials, user guides, and device interfaces. For example, Apple presents Instant Hotspot as a Continuity feature and instructs users to select a nearby iPhone or cellular iPad from the Mac's Wi-Fi menu to connect to the internet. A user can use that connection to stream Apple Music on the Mac, download photos and videos from iCloud Photos, or participate in a FaceTime call. In each example, the iPhone or cellular iPad carries the Mac's internet traffic between the cellular network and the Mac's Wi-Fi connection. *See* https://support.apple.com/en-us/108046; https://support.apple.com/en-us/109321.

165. Apple also instructs users to enable Internet Sharing in macOS System Settings and select the connection to share and the interface through which other devices can connect. For example, a user can configure a MacBook to share an Ethernet internet connection over Wi-Fi with an iPad that is streaming music or downloading photos and videos. The MacBook forwards the iPad's traffic between the Ethernet connection and the Wi-Fi connection. *See* https://support.apple.com/guide/mac-help/share-internet-connection-mac-network-users-mchlp1540/mac.

166. Apple publishes user guides on its support website instructing customers how to configure and use features of Apple products running specified versions of Apple's operating systems.[42] Apple also identifies the product models compatible with those operating-system

[42] *See iPhone User Guide*, https://support.apple.com/guide/iphone/welcome/26/ios/26 (accessed Nov. 3, 2026); *Share the internet connection on Mac with other network users*, https://support.apple.com/guide/mac-help/share-internet-connection-mac-network-users-mchlp1540/15.0/mac/15.0 (accessed Nov. 6, 2026).

versions.[43]

167. The online user guides on the Apple support webpage include instructions on how to configure the Accused Wireless Relay Devices and Accused Wireless Relay Laptops, as the case may be, to operate as a wireless relay:[44]

> # Share your internet connection from your iPhone
>
> You can share the internet connection from your iPhone with other devices using a feature called Instant Hotspot. Instant Hotspot uses the Personal Hotspot on your iPhone, and is useful when your other device doesn't have internet access from a Wi-Fi network.
>
> There are several ways to connect other devices to your Personal Hotspot:
>
> - Connect your other device to your iPhone through Wi-Fi settings.
> - Pair your two devices with Bluetooth®.
> - Connect your other device to your iPhone with a cable.
>
> You can share the Personal Hotspot on your iPhone with another iPhone, an iPad, a Mac, a Windows device, and more.
>
> *Note:* Personal Hotspot isn't available with all carriers. Additional fees may apply. The number of devices that can join your Personal Hotspot at one time depends on your carrier and iPhone model. Contact your carrier for more information.

Excerpt from "Share your internet connection from your iPhone,"
https://support.apple.com/guide/iphone/share-your-internet-connection-iph45447ca6/26/ios/26
(accessed Nov. 3, 2026)

---

[43] *See, e.g.*, *iPhone models compatible with iOS 26*, https://support.apple.com/guide/iphone/iphone-models-compatible-with-ios-26-iphe3fa5df43/26/ios/26 (accessed Nov. 3, 2026); *macOS Sequoia is compatible with these computers*, https://support.apple.com/en-us/120282 (accessed Nov. 6, 2026).

[44] *See, e.g., Share your internet connection from your iPhone*, https://support.apple.com/guide/iphone/share-your-internet-connection-iph45447ca6/26/ios/26 (accessed Nov. 3, 2026); *Share the internet connection on Mac with other network users*, https://support.apple.com/guide/mac-help/share-internet-connection-mac-network-users-mchlp1540/15.0/mac/15.0 (accessed Nov. 6, 2026).

168. A user of the iPhone 12 (A2172) could configure their iPhone 12 (A2172) to operate as a wireless relay based on the instructions in the Apple user manual.

169. A user of the iPhone 14 (A2649) could configure their iPhone 14 (A2649) to operate as a wireless relay based on the instructions in the Apple user manual.

170. A user of the iPhone 16 (A3081) could configure their iPhone 16 (A3081) to operate as a wireless relay based on the instructions in the Apple user manual.

171. A user of the iPad Pro (A2379) could configure their iPad Pro (A2379) to operate as a wireless relay based on the instructions in the Apple user manual.

172. The components of the Accused Wireless Relay Devices that provide the wireless relay capability have no substantial use other than to provide the wireless relay capability.

173. The components of the Accused Wireless Relay Laptops that provide the wireless relay capability have no substantial use other than to provide the wireless relay capability.

174. The components of the Accused Wireless Relay Devices that provide the wireless relay capability are a material part of the claims of the Intelligent Wireless Broadband Relay Patents.

175. The components of the Accused Wireless Relay Laptops that provide the wireless relay capability are a material part of the claims of the ’194, ’812, ’754, and ’337 Patents.

**ii. Antenna-Tuning Mobile Devices**

176. Apple makes, has made, uses, sells, offers to sell, and/or distributes in the United States, and/or imports into the United States, wireless devices having multiband antenna arrangements, including electronically controlled antenna-tuning circuitry and shared antennas connected to receiver, transmitter, or transceiver circuitry operating in different frequency bands (“Accused Antenna-Tuning Mobile Devices”), including but not limited to (i) smartphones, such

as but not limited to the iPhone XR, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone SE (2nd generation), iPhone 12, iPhone 12 mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone 13, iPhone 13 mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (3rd generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, iPhone 16e, iPhone 17, iPhone Air, iPhone 17 Pro, iPhone 17 Pro Max, iPhone 17e, iPhone 18 Pro, iPhone 18 Pro Max, iPhone Duo model smartphones, and (ii) tablets, such as but not limited to the iPad (7th generation), iPad (8th generation), iPad (9th generation), iPad (10th generation), iPad (11th generation / A16), iPad mini (5th generation), iPad mini (6th generation), iPad mini (A17 Pro), iPad Air (3rd generation), iPad Air (4th generation), iPad Air (5th generation), iPad Air 11-inch (M2), iPad Air 13-inch (M2), iPad Air 11-inch (M3), iPad Air 13-inch (M3), iPad Air 11-inch (M4), iPad Air 13-inch (M4), iPad Pro 11-inch (2nd generation), iPad Pro 12.9-inch (4th generation), iPad Pro 11-inch (3rd generation), iPad Pro 12.9-inch (5th generation), iPad Pro 11-inch (4th generation), iPad Pro 12.9-inch (6th generation), iPad Pro 11-inch (M4), iPad Pro 13-inch (M4), iPad Pro 11-inch (M5), iPad Pro 13-inch (M5) model tablets.

177. The Accused Antenna-Tuning Mobile Devices include electronically controlled antenna-tuning circuitry positioned between the radio circuitry and an antenna. The tuning circuitry configures the connection between the radio circuitry and the antenna for operation in multiple frequency bands, including multiple sub-6 GHz bands.

178. Upon information and belief, representative Accused Antenna-Tuning Mobile Devices include the iPhone 13 Pro Max (model A2484) and the cellular iPad Pro 13-inch (M4) (model A2926). The iPhone 13 Pro Max includes a Qualcomm Snapdragon X60 modem and SDR868 RF transceiver, together with antenna-tuning circuitry incorporating Qorvo and

Peregrine/pSemi tuner components.[45] The cellular iPad Pro 13-inch (M4) includes a Qualcomm Snapdragon X70 modem and SDR735-001 RF transceiver, together with electronically controlled antenna-tuning circuitry. In each representative device, the tuning circuitry configures the connection between the radio circuitry and at least one antenna for operation in multiple cellular frequency bands, including multiple sub-6 GHz bands.

179. At least some Accused Antenna-Tuning Mobile Devices include at least one antenna tunable for operation in multiple sub-6 GHz 5G frequency bands, with electronically controlled tuning circuitry electrically coupled between the RF transceiver circuitry and the antenna feedpoint.

180. At least some Accused Antenna-Tuning Mobile Devices use electronic control signals to select or interconnect passive tuning elements, including capacitors and/or inductors, to configure the connection between RF transceiver circuitry and an antenna for operation in multiple frequency bands, including sub-6 GHz 5G bands.

181. At least some Accused Antenna-Tuning Mobile Devices use electronically controlled tuning circuitry to tune at least one antenna used in MIMO operation for operation in multiple sub-6 GHz 5G frequency bands.

182. At least some Accused Antenna-Tuning Mobile Devices include a tuner circuit

---

[45] Qualcomm and Peregrine/pSemi maintain major research, development, and design locations in this district. *See* Eric Henrikson, *Qualcomm Plans $16M Expansion of North Austin Research and Office Facility*, KXAN (Aug. 10, 2026), https://www.kxan.com/news/local/austin/qualcomm-plans-16m-expansion-of-north-austin-research-and-office-facility/; Peregrine Semiconductor, *Peregrine Semiconductor Opens Austin Development Center*, Press Releases (Feb. 16, 2017), https://psemi.com/newsroom/press-releases/762894-peregrine-semiconductor-opens-austin-development-center/. Qorvo maintains two locations in eastern Texas and is headquartered in North Carolina. *See Where We Are*, Qorvo, https://www.qorvo.com/about#where-we-are (last visited Nov. 17, 2026).

electrically coupled between an RF transceiver integrated circuit ("IC") and an antenna feedpoint, with the tuner circuit comprising passive components, including capacitors and/or inductors, and electronically controlled switching circuitry.

183. Upon information and belief, the Accused Antenna-Tuning Mobile Devices include a shared multiband antenna connected to cellular and Wi-Fi radio circuitry, or to Wi-Fi and narrowband U-NII radio circuitry. In supported operating configurations, the connected radio circuitry transmits electromagnetic energy simultaneously in different frequency bands through the shared antenna.

184. Upon information and belief, the Accused Antenna-Tuning Mobile Devices include band-specific tuning circuitry on an RF path between a shared multiband antenna and one of the connected radio components. The tuning circuitry matches electromagnetic energy in a particular frequency band to only that component, while another connected radio component uses the shared antenna in a different frequency band.

185. Upon information and belief, the Accused Antenna-Tuning Mobile Devices include frequency-selective filter circuitry on an RF path between a shared multiband antenna and Wi-Fi circuitry. The filter circuitry passes Wi-Fi signals and attenuates signals in more than one other frequency band supported by the shared antenna, thereby isolating the Wi-Fi circuitry from those other frequency bands.

186. Upon information and belief, the Accused Antenna-Tuning Mobile Devices include spatially separated antenna elements forming an antenna array configured for use and implemented in a MIMO system. At least one antenna forming the array is shared by radio components operating in different frequency bands.

187. Upon information and belief, the Accused Antenna-Tuning Mobile Devices include spatially separated antenna elements and electronically controlled switching circuitry forming a beam switchable array. The switching circuitry selects among the antenna elements to select the radiation pattern used for wireless communications. At least one antenna forming the array supports multiple frequency bands and is connected to radio components operating in different frequency bands.

188. At least some Accused Antenna-Tuning Mobile Devices implement Wi-Fi 7 Multi-Link Operation ("MLO"). MLO allows a wireless device and an access point to establish and manage multiple Wi-Fi links under a single logical connection. In some implementations, the wireless device transmits or receives simultaneously on links in different frequency bands.

189. The iPhone 17 (model A3258) implements MLO. The A3258 supports simultaneous Wi-Fi transmission in the 2.4 GHz and 5 GHz bands and in the 2.4 GHz and 6 GHz bands. Its FCC SAR Evaluation Report identifies those band combinations as supported simultaneous-transmission configurations. See UL Verification Services Inc., SAR Evaluation Report, FCC ID BCG E8947A, Report No. 15496277 S1V3, p. 324, configurations 6 and 7.

190. The 13-inch iPad Air with M4 (model A3461) implements MLO.

191. The A3461's FCC RF Exposure Report identifies the physical antenna designated WF7b for both the 2.4 GHz and 5 GHz Wi-Fi transmissions in one simultaneous-transmission scenario. The report also identifies WF7b for both the 2.4 GHz and 6 GHz Wi-Fi transmissions in another simultaneous-transmission scenario. See FCC ID BCGA3461, RF Exposure Report, Appendix E, "Multi-TX and Antenna SAR Considerations," p. 2, Tables E 3 and E 4, and p. 5, Table E 16.

192. When the A3461 operates in MLO with a 2.4 GHz Wi-Fi link and a 6 GHz Wi-Fi link, its Wi-Fi transmit circuitry transmits on both links simultaneously through WF7b.

193. The A3461 uses WF7b and WF2b together for 2.4 GHz Wi-Fi MIMO. WF7b is an element of that MIMO antenna array. See FCC ID BCGA3461, RF Exposure Report, Appendix E, p. 2, Table E 4.

194. Upon information and belief, at least some Accused Antenna-Tuning Mobile Devices, including the A3461, implement MLO using one or more transmitters, receivers, or transceivers connected to a common multiband antenna. In those devices, the connected circuitry transmits or receives simultaneously on MLO links in different frequency bands through that same antenna, as recited in claim 13 of the ’763 Patent.

195. Upon information and belief, in at least some Accused Antenna-Tuning Mobile Devices, including the A3461, the common multiband antenna used for MLO forms part of an antenna array. In those devices, a connected transmitter, receiver, or transceiver transmits or receives simultaneously through that antenna in different frequency bands, or two or more connected transmitters, receivers, or transceivers transmit or receive through that antenna in different frequency bands, as recited in claim 19 of the ’358 Patent.

196. The Accused Antenna-Tuning Mobile Devices infringe at least one claim of each of the ’763 and ’358 Patents. Upon information and belief, the other Accused Antenna-Tuning Mobile Devices include structures and perform functions that likewise satisfy the claim limitations of the ’763 and ’358 Patents.

197. The antenna-tuning circuitry and associated control logic in the Accused Antenna-Tuning Mobile Devices that electronically select or interconnect passive tuning elements between the RF transceiver circuitry and an antenna feedpoint are a material part of the inventions claimed

in the '763 and '358 Patents.

198. The shared multiband antenna arrangements and connected radio circuitry, band-specific matching circuitry, isolation circuitry, and antenna-array circuitry in the Accused Antenna-Tuning Mobile Devices also constitute material parts of the respective inventions claimed in the '763 and '358 Patents.

199. The antenna-tuning circuitry and associated control logic in the Accused Antenna-Tuning Mobile Devices that electronically select or interconnect passive tuning elements between the RF transceiver circuitry and an antenna feedpoint are especially made or adapted for use in infringing the '763 and '358 Patents and have no substantial noninfringing use.

200. The corresponding radio circuitry and RF connections, matching circuitry, isolation circuitry, and antenna-array circuitry in the Accused Antenna-Tuning Mobile Devices, as configured in the Accused Antenna-Tuning Mobile Devices, are especially made or adapted for use in infringing the respective asserted claims and have no substantial noninfringing use.

201. Apple provides user manuals, setup guides, and support materials instructing customers how to activate cellular service and configure the Accused Antenna-Tuning Mobile Devices for cellular communications, including communications using 4G LTE or 5G networks. Apple also provides instructions directing users of the accused iPhones to enable Wi-Fi, connect to Wi-Fi networks, enable Bluetooth, and pair and connect Bluetooth accessories.

202. Following Apple's cellular-service instructions causes the Accused Antenna-Tuning Mobile Devices to perform cellular communications during which the devices use electronically controlled tuning circuitry to configure the connection between RF transceiver circuitry and an antenna for operation in different frequency bands. Upon information and belief, at least some customers and end users in the United States also follow Apple's Wi-Fi and Bluetooth

instructions and use the accused iPhones in supported configurations involving simultaneous cellular and Wi-Fi communications or simultaneous cellular and Bluetooth communications. During those uses, the connected radio circuitry uses a shared multiband antenna for communications in different frequency bands, with the applicable tuning, matching, and isolation circuitry operating as described above.

203. For example, Apple's online iPhone User Guide includes a webpage, "*View or change cellular data settings on iPhone,*" which instructs users to go to Settings > Cellular and turn cellular data on. When users follow those instructions and use the accused devices for cellular communications in supported frequency bands, the devices perform the antenna-tuning operations described above.[46]

204. Apple's online iPhone User Guide includes a webpage titled "Connect iPhone to the internet," which instructs users to open the Settings app, tap Wi-Fi, and turn on Wi-Fi. The webpage further instructs users to join an available network by tapping its name and entering a password if requested, or to join a hidden network by entering its name, security type, and password. Apple thereby instructs and encourages users to enable and use Wi-Fi communications on the accused iPhones. *See* Apple, iPhone User Guide, "Connect iPhone to the internet,"

---

[46] *See "View or change cellular data settings on iPhone,"* https://support.apple.com/guide/iphone/view-or-change-cellular-data-settings-iph3dd5f213/26/ios/26 (accessed Nov. 3, 2026). This URL is for iPhones compatible with iOS 26. Apple identifies its iPhone models compatible with iOS 26 at https://support.apple.com/guide/iphone/iphone-models-compatible-with-ios-26-iphe3fa5df43/26/ios/26. Apple iPhones compatible with iOS 26 include the following Accused Antenna-Tuning Mobile Devices: iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone SE (2nd generation), iPhone SE (3rd generation), iPhone 12, iPhone 12 mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone 13, iPhone 13 mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, iPhone 16e, iPhone 17, iPhone 17 Pro, iPhone 17 Pro Max, iPhone 17e, iPhone Air.

https://support.apple.com/guide/iphone/connect-to-the-internet-iphd1cf4268/26/ios/26 (accessed Nov. 19, 2026).

205. Apple's online iPhone User Guide also includes a webpage titled "Connect iPhone to Bluetooth accessories," which instructs users to place a Bluetooth accessory in discovery mode, go to Settings > Bluetooth on the iPhone, make sure Bluetooth is turned on, and tap the accessory's name when it appears onscreen. The webpage encourages users to connect Bluetooth accessories to stream music and videos, play games, connect to keyboards, and perform other activities. Apple thereby instructs and encourages users to enable and use Bluetooth communications on the accused iPhones. Apple, iPhone User Guide, "Connect iPhone to Bluetooth accessories," https://support.apple.com/guide/iphone/connect-bluetooth-accessories-iph3c50f191/26/ios/26 (accessed Nov. 19, 2026).

**iii. Multiband Antenna Laptops**

206. Apple makes, has made, uses, sells, offers to sell, and/or imports into the United States portable laptop computers having shared multiband antenna arrangements through which connected receiver, transmitter, or transceiver components operate in multiple frequency bands, including simultaneously (the "Accused Multiband Antenna Laptops"). The Accused Multiband Antenna Laptops include at least the following representative products: the 2026 MacBook Pro 14-inch with M5 Pro (model A3426); the 2026 MacBook Pro 14-inch with M5 Max (model A3427); the 2026 MacBook Pro 16-inch with M5 Pro (model A3428); the 2026 MacBook Pro 16-inch with M5 Max (model A3429); the 2024 MacBook Pro 14-inch with M4 (model A3112); the 2024 MacBook Pro 14-inch with M4 Pro (model A3401); the 2024 MacBook Pro 14-inch with M4 Max (model A3185); the 2024 MacBook Pro 16-inch with M4 Pro (model A3403); the 2024 MacBook Pro 16-inch with M4 Max (model A3186); the 2025 MacBook Air 13-inch with M4

(model A3240); the 2025 MacBook Air 15-inch with M4 (model A3241); the 2025 MacBook Pro 14-inch with M5 (model A3434); the 2021 MacBook Pro 14-inch with M1 Pro or M1 Max (model A2442); the 2021 MacBook Pro 16-inch with M1 Pro or M1 Max (model A2485); the 2022 MacBook Air 13-inch with M2 (model A2681); the 2023 MacBook Pro 14-inch with M2 Pro or M2 Max (model A2779); the 2023 MacBook Pro 16-inch with M2 Pro or M2 Max (model A2780); the late-2023 MacBook Pro 14-inch with M3 Pro or M3 Max (model A2992); the late-2023 MacBook Pro 16-inch with M3 Pro or M3 Max (model A2991); and the 2024 MacBook Air 15-inch with M3 (model A3114).

207. The Accused Multiband Antenna Laptops are wireless portable devices having one or more antennas operating at particular frequency bands, including at least one antenna operating at multiple particular frequency bands. Upon information and belief, at least one such antenna is used for communications in the 2.4 GHz Bluetooth band and the 5 GHz Wi-Fi band, and, in models supporting 6 GHz Wi-Fi, also in the 6 GHz Wi-Fi band.

208. For example, Apple's FCC submissions for model A3427 (MacBook Pro, 14-inch, M5 Max), FCC ID BCGA3427, identify physical antennas designated WF1, WF2, and WF3. The antenna assignments identify WF1 and WF2 as each, individually, serving multiple bands (e.g., 2.4 GHz, 5 GHz, and 6 GHz), including both Wi-Fi and Bluetooth functions at the 2.4 GHz band. The submissions map the radio path designated Core 0 to WF1 and the radio path designated Core 1 to WF2.

209. Upon information and belief, each Accused Multiband Antenna Laptop includes Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuitry implemented in a wireless networking chip or module, including Apple's N1 wireless chip in models A3426, A3427, A3428, and A3429. At least one multiband antenna is connected to that circuitry for operation in multiple

frequency bands, including the 2.4 GHz Bluetooth band and the 5 GHz and/or 6 GHz Wi-Fi bands. In representative model A3427, Apple's FCC submissions map Wi-Fi and Bluetooth functions on Core 0 to antenna WF1 and on Core 1 to antenna WF2.

210. Upon information and belief, the Wi-Fi and Bluetooth radio circuitry in each Accused Multiband Antenna Laptop connected to at least one shared multiband antenna includes either one receiver, transmitter, or transceiver component operating simultaneously at two or more particular frequency bands, or two or more receiver, transmitter, or transceiver components operating simultaneously at two or more particular frequency bands. In either arrangement, the connected circuitry uses at least one shared multiband antenna for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band.

211. A Specific Absorption Rate (SAR) report for Apple's A3427 (*see* FCC ID: BCGA3427, Doc. No. 75962873-17) identifies achievable simultaneous-transmission combinations pairing 5 GHz WLAN Core 0 with 2.4 GHz Bluetooth Core 0 and pairing 6 GHz WLAN Core 0 with 2.4 GHz Bluetooth Core 0. Read together with the assignment of Core 0 to WF1, those combinations support simultaneous operation of connected Wi-Fi and Bluetooth radio circuitry in different frequency bands using WF1. A separate FCC and ISED Test Report for the A3427 (*see* FCC ID: BCGA3427, Doc. No. 75963990-44) documents concurrent WLAN and Bluetooth testing, including testing at 5,240 MHz and 2,441 MHz.

212. Apple's FCC submissions for additional representative models A3112 (FCC ID BCGA3112), A3185 (FCC ID BCGA3185), A3241 (FCC ID BCGA3241), and A3434 (FCC ID BCGA3434) likewise identify shared Wi-Fi/Bluetooth antenna structures and achievable simultaneous operation of Wi-Fi and Bluetooth radio functions in different frequency bands. The internal photographs identify antenna structures designated WF1/BT and WF2/BT and a Wi-Fi/BT

module in each model. The SAR reports identify simultaneous-transmission combinations pairing 5 GHz or 6 GHz WLAN with 2.4 GHz Bluetooth on Core 0. *See* FCC ID BCGA3112, Doc. No. 75960544-20; FCC ID BCGA3185, Doc. No. 75960544-43; FCC ID BCGA3241, Doc. No. 75960544-66; and FCC ID BCGA3434, Doc. No. 75962873-03.

213. Apple's FCC submissions for models A2442, A2485, A2681, A2779, A2780, A2991, and A2992 expressly disclose that Bluetooth and WLAN can operate on the same antenna and include simultaneous-transmission analyses combining 2.4 GHz Bluetooth with 5 GHz WLAN or, where supported, 6 GHz WLAN. *See* FCC ID BCGA2442, Report No. 75952057-16, Issue 5; FCC ID BCGA2485, Report No. 75952054-16, Issue 3; FCC ID BCGA2681, Report No. 75954444-22, Issue 2; FCC ID BCGA2779, Report No. 75955428-12, Issue 2; FCC ID BCGA2780, Report No. 75955429-22, Issue 1; FCC ID BCGA2991, Report No. 75958013-14, Issue 1; and FCC ID BCGA2992, Report No. 75958013-9, Issue 1.

214. Apple's FCC submissions for model A3114 likewise identify achievable simultaneous transmission of 5 GHz or 6 GHz WLAN and 2.4 GHz Bluetooth on Core 0. *See* FCC ID BCGA3114, Report No. 75958013-48, Issue 1.

215. Separate simultaneous-transmission reports for representative models A3185 and A3241 document concurrent testing of WLAN at 5,240 MHz and Bluetooth at 2,441 MHz, identifying Core 0 and Core 1 for both technologies. Read together with the shared Wi-Fi/Bluetooth antenna identifications and same-core simultaneous-transmission combinations, these disclosures support simultaneous operation of connected Wi-Fi and Bluetooth radio circuitry in different frequency bands through a shared multiband antenna. *See* FCC ID BCGA3185, Report No. 75961394-101, Issue 01; FCC ID BCGA3241, Report No. 75962766-44, Issue 01.

216. Separate simultaneous-transmission reports for models A2681, A2779, A2780, A2991, A2992, and A3114 also document concurrent 5 GHz WLAN and 2.4 GHz Bluetooth testing, identifying Core 0 and Core 1 for both technologies. *See* FCC ID BCGA2681, Report No. 75954421-14; FCC ID BCGA2779, Report No. 75955428-10; FCC ID BCGA2780, Report No. 75955429-19; FCC ID BCGA2991, Report No. 75957632-75; FCC ID BCGA2992, Report No. 75957632-51; and FCC ID BCGA3114, Report No. 75959606-11.

217. Separate reports for models A2442 and A2485 additionally document concurrent WLAN and Bluetooth testing. *See* FCC ID BCGA2442, Report No. 75952057-14; FCC ID BCGA2485, Report No. 75952054-14.

218. The Accused Multiband Antenna Laptops include antennas having elements or sub-elements and forming an antenna array. Upon information and belief, at least one antenna forming that array is connected to the laptop's Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuitry and is used by that circuitry for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band. For representative model A3427, Figure 1 and Table 94 of the SAR report identify spatially separated antennas WF1 and WF2 and their multiband functions. In Table 6 of the separate simultaneous-transmission emissions report for representative model A3427, Core 0 and Core 1 operation are identified with cyclic delay diversity. *See* FCC ID BCGA3427, Doc. No. 75962873-17 and Doc. No. 75963990-44. Upon information and belief, WF1 and WF2 and their constituent elements or sub-elements form an antenna array. Apple's FCC submissions for representative models A3112, A3185, and A3434 likewise depict spatially separated antennas designated WF1, WF2, and WF3, while the submissions for representative model A3241 depict spatially separated antenna structures designated WF1/BT and WF2/BT. FCC documents for representative models A3112, A3185,

A3241 and A3434 also identify WLAN MIMO operation using Core 0 and Core 1. *See* FCC ID BCGA3112, Doc. No. 75960544-20; FCC ID BCGA3185, Doc. No. 75960544-43; FCC ID BCGA3241, Doc. No. 75960544-66; and FCC ID BCGA3434, Doc. No. 75962873-03. The FCC SAR reports for models A2442, A2485, A2779, A2780, A2991, and A2992 likewise depict spatially separated antennas designated WF1, WF2, and WF3. The SAR report for model A3114 depicts two antenna structures designated WF1/BT and WF2/BT, and the antenna-gain plots for model A3114 separately characterize WF1 and WF2 in the 2.4 GHz, 5 GHz, and 6 GHz bands. The FCC SAR reports for models A2442, A2485, A2779, A2780, A2991, and A2992 and model A2681 also identify 2×2 WLAN MIMO operation. *See* FCC ID BCGA2442, Report No. 75952057-16, Issue 5, pp. 25–26; FCC ID BCGA2485, Report No. 75952054-16, Issue 3, pp. 23–24; FCC ID BCGA2681, Report No. 75954444-22, Issue 2, p. 12; FCC ID BCGA2779, Report No. 75955428-12, Issue 2, p. 25, and antenna-location exhibit; FCC ID BCGA2780, Report No. 75955429-22, Issue 1, p. 24, and antenna-location exhibit; FCC ID BCGA2991, Report No. 75958013-14, Issue 1, pp. 23–24; FCC ID BCGA2992, Report No. 75958013-9, Issue 1, pp. 24–25; FCC ID BCGA3114, Report No. 75958013-48, Issue 1, p. 26, and antenna-gain plots, pp. 1–7. Upon information and belief, the shared multiband antenna structures and their constituent elements or sub-elements form an antenna array in models A2442, A2485, A2681, A2779, A2780, A2991, and A2992.

219. The following 2026 MacBook Pro models each include Apple's N1 wireless chip and support both Wi-Fi 7 and Bluetooth: the 14-inch model with M5 Pro (A3426), the 14-inch model with M5 Max (A3427), the 16-inch model with M5 Pro (A3428), and the 16-inch model with M5 Max (A3429). *See* https://support.apple.com/en-us/126318; https://support.apple.com/en-us/126319.

220. Upon information and belief, models A3426, A3428, and A3429 have materially the same shared multiband antenna and Wi-Fi/Bluetooth radio arrangements relevant to the asserted claims as representative model A3427; model A3240 has materially the same relevant arrangements as representative model A3241; and models A3401, A3403, and A3186 have materially the same relevant arrangements as representative models A3112 and A3185. The similarities of the identified models include Wi-Fi and Bluetooth radio circuitry connected to shared multiband antennas for simultaneous operation in different frequency bands, including antennas having elements or sub-elements and forming an antenna array.

221. At least some Accused Multiband Antenna Laptops, including the 14-inch MacBook Pro with M5 Max (model A3427), implement MLO.

222. Apple's FCC filing for the A3427 identifies simultaneous-transmission test configurations in which the A3427 transmits Wi-Fi signals in the 2.4 GHz and 5 GHz bands and other configurations in which it transmits Wi-Fi signals in the 2.4 GHz and 6 GHz bands. *See* FCC and ISED Test Report, FCC ID BCGA3427, Document No. 75963990 44, Issue 01, p. 4.

223. The A3427 has two physical antennas designated WF1 and WF2. Radio Core 0 is connected to WF1, and Radio Core 1 is connected to WF2. Each antenna supports Wi-Fi transmission in the 2.4 GHz, 5 GHz, and 6 GHz bands. The A3427 uses WF1 and WF2 together as elements of a Wi-Fi MIMO antenna array. *See* TÜV SÜD, SAR Test Report, FCC ID BCGA3427, Document No. 75962873 17, Issue 01, p. 47, Table 94.

224. Upon information and belief, at least some Accused Multiband Antenna Laptops implement MLO using one or more transmitters, receivers, or transceivers connected to a common multiband antenna. During MLO, the connected circuitry in those laptops transmits or receives

simultaneously on links in different frequency bands through that same antenna, as recited in claim 13 of the ’763 Patent.

225. Upon information and belief, in at least some Accused Multiband Antenna Laptops, the common multiband antenna used during MLO forms part of an antenna array. In those laptops, either one connected transmitter, receiver, or transceiver transmits or receives simultaneously through that antenna in different frequency bands, or two or more connected transmitters, receivers, or transceivers transmit or receive through that antenna in different frequency bands, as recited in claim 19 of the ’358 Patent.

226. At least models A3426, A3427, A3428, A3429, A3112, A3401, A3185, A3403, A3186, A3240, A3241, A3434, A2442, A2485, A2681, A2779, A2780, A2991, A2992, and A3114 of the Accused Multiband Antenna Laptops infringe at least claim 13 of the ’763 Patent and at least claim 19 of the ’358 Patent, literally or under the doctrine of equivalents. Apple directly infringes those claims by making, using, selling, offering to sell, and/or importing these models in the United States without authorization from MASSIVELY BROADBAND.

227. Apple provides online user guides instructing customers how to configure and use Wi-Fi and Bluetooth communications on the Accused Multiband Antenna Laptops. For example, Apple’s online guide “Connect your Mac to the internet” instructs users to click the Wi-Fi icon in the menu bar, choose a network, and enter the network password if required. Apple’s guide “Connect a Bluetooth device with your Mac” instructs users to open System Settings, select Bluetooth, and connect a discoverable Bluetooth accessory, including a keyboard, mouse, trackpad, headphones, or speakers. *See* https://support.apple.com/guide/mac-help/connect-to-the-internet-mchld1690538/mac; https://support.apple.com/guide/mac-help/connect-a-wireless-accessory-blth1004/mac.

228. Upon information and belief, customers and end users of the Accused Multiband Antenna Laptops in the United States follow Apple's instructions and use the Accused Multiband Antenna Laptops for concurrent Wi-Fi and Bluetooth communications. During the use of the Accused Multiband Antenna Laptops for concurrent Wi-Fi and Bluetooth communications, the laptop's Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuitry uses at least one shared multiband antenna for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band. Upon information and belief, in each Accused Multiband Antenna Laptop, at least one antenna shared by the Wi-Fi and Bluetooth circuitry includes one or more antenna elements or sub-elements, and that antenna forms part of the laptop's antenna array. Customers and end users thereby directly infringe at least claim 13 of the '763 Patent and at least claim 19 of the '358 Patent. With knowledge of the '763 and '358 Patents and with knowledge that these uses of the Accused Multiband Antenna Laptops infringe the '763 and '358 Patents, Apple continues to supply the Accused Multiband Antenna Laptops and instructions that encourage customers and end users to connect and use Wi-Fi networks and Bluetooth accessories, with the specific intent to cause that direct infringement.

229. Upon information and belief, the Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuits in each Accused Multiband Antenna Laptop, together with the connections of the circuits to at least one shared multiband antenna, constitute a material part of the invention claimed in at least claim 13 of the '763 Patent. The circuitry and the connected antenna in the Accused Multiband Antenna Laptops support simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band through the shared antenna. Upon information and belief, the circuitry and its connections to antennas that have elements or sub-elements and that form an antenna array also constitute a material part of the invention claimed

in at least claim 19 of the ’358 Patent. In representative model A3427, the connected multiband antennas include WF1 and WF2.

230. Upon information and belief, the Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuits and associated RF connections to a shared multiband antenna in the Accused Multiband Antenna Laptops are especially made or adapted for use in infringing at least claim 13 of the ’763 Patent and have no substantial noninfringing use. Upon information and belief, the Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuits and associated RF connections to antennas that have elements or sub-elements and that form an antenna array in the Accused Multiband Antenna Laptops are especially made or adapted for use in infringing at least claim 19 of the ’358 Patent and have no substantial noninfringing use.

231. Apple sells and offers to sell the Accused Multiband Antenna Laptops in the United States. Upon information and belief, the Accused Multiband Antenna Laptops incorporate Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuits and associated RF connections to shared multiband antennas, including antennas that have elements or sub-elements and that form an antenna array. For example, models A3426, A3427, A3428, and A3429 incorporate Apple’s N1 wireless chip, while the FCC internal photographs for models A3112, A3185, A3241, A3434, and A2992 identify a Wi-Fi/BT module. With knowledge of the ’763 and ’358 Patents and with knowledge that these circuitry-and-antenna combinations are especially made or adapted for infringing use, Apple’s sale or offer for sale of these circuitry-and-antenna combinations as incorporated in the Accused Multiband Antenna Laptops contributes to direct infringement by customers and end users in the United States who use the Accused Multiband Antenna Laptops for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band through a shared multiband antenna, which infringes at least

claim 13 of the ’763 Patent and, when that antenna forms part of an antenna array that has elements or sub-elements, infringes at least claim 19 of the ’358 Patent.

**iv. Steerable Antenna Mobile Devices**

232. Apple makes, has made, uses, sells, offers to sell, and/or distributes in the United States, and/or imports into the United States, wireless devices that use sensor information to adjust the radiation pattern of a steerable antenna that operate at one or more frequencies in the range of 10 GHz to 500 GHz to avoid or reduce radiation toward a user or other structure (“Accused Steerable Antenna Mobile Devices”), including but not limited to (i) smartphones, such as but not limited to the mmWave-capable versions of the iPhone 12, iPhone 12 mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone 13, iPhone 13 mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, iPhone 17, iPhone Air, iPhone 17 Pro, iPhone 17 Pro Max, iPhone 18 Pro, iPhone 18 Pro Max, and iPhone Duo model smartphones, and (ii) tablets, such as but not limited to the Wi-Fi + Cellular versions of the iPad Pro 11-inch (3rd generation) (model A2301), iPad Pro 12.9-inch (5th generation) (model A2379), iPad Pro 11-inch (4th generation) (model A2435), and iPad Pro 12.9-inch (6th generation) (model A2764) model tablets.

233. 5G cellular networks support operation at frequencies greater than 10 GHz and less than 500 GHz.

234. Frequency Range 2 (“FR2”), one of the frequency ranges supported by 5G, includes two subranges: FR2-1, extending from 24.25 GHz to 52.6 GHz, and FR2-2, extending from 52.6 GHz to 71 GHz.

235. Both FR2-1 and FR2-2 lie entirely within the range of 10 GHz to 500 GHz.

236. The FR2 frequency range corresponds to free-space wavelengths of approximately 4.2 mm to 12.36 mm.

237. In the wireless industry, FR2 frequencies are commonly referred to as "millimeter wave" or "mmWave" frequencies.

238. FR2 bands that have frequencies greater than 10 GHz and less than 500 GHz, and that are used in the United States by U.S.-based cellular carriers, include the n260 and n261 bands.

239. The n260 band extends from 37 GHz to 40 GHz and is commonly identified as the 39 GHz band. These frequencies are greater than 10 GHz and less than 500 GHz.

240. The n261 band extends from 27.5 GHz to 28.35 GHz and is commonly identified as the 28 GHz band. These frequencies are greater than 10 GHz and less than 500 GHz.

241. The Accused Steerable Antenna Mobile Devices include at least one steerable antenna operable in one or more mmWave frequency bands, including n260 and/or n261, at frequencies within the range of 10 GHz to 500 GHz.

242. At least some of the Accused Steerable Antenna Mobile Devices include at least one steerable antenna that is used in MIMO operation at one or more frequencies in the range of 10 GHz to 500 GHz.

243. At least some of the Accused Steerable Antenna Mobile Devices include at least one steerable antenna that is operable in the n260 and/or n261 bands.

244. At least some of the Accused Steerable Antenna Mobile Devices use at least one steerable antenna for MIMO operation in the n260 and/or n261 bands.

245. At least some of the Accused Steerable Antenna Mobile Devices, including but not limited to the iPhone 17 Pro Max (model A3257), include a Qualcomm QTM565-based mmWave antenna solution and a Qualcomm Snapdragon X80 modem.

246. The Qualcomm QTM565-based mmWave antenna solution supports electronic beam steering and beamforming through control of antenna-element signals and operates in mmWave 5G frequency bands, including n260 and n261.

247. The Accused Steerable Antenna Mobile Devices include one or more sensors, including cameras, gyroscopes, accelerometers, and/or light detectors.

248. Upon information and belief, the Accused Steerable Antenna Mobile Devices steer mmWave radiation away from a user or other obstacle detected using one or more sensors of the device.

249. Upon information and belief, the Accused Steerable Antenna Mobile Devices perform that steering based on the determined directions that correspond to the user or other obstacle relative to at least one steerable antenna of the device.

250. The Accused Steerable Antenna Mobile Devices infringe at least one claim of each of the ’625 and ’548 Patents. Upon information and belief, the other Accused Steerable Antenna Mobile Devices include structures and perform functions that likewise satisfy the claim limitations of the ’625 and ’548 Patents.

251. The antenna controller and associated control logic in the Accused Steerable Antenna Mobile Devices that use sensor information to adjust a steerable antenna’s radiation pattern to avoid or reduce radiation toward a user or other structure are a material part of the inventions claimed in the ’625 and ’548 Patents.

252. The antenna controller and associated control logic in the Accused Steerable Antenna Mobile Devices that use sensor information to adjust a steerable antenna’s radiation pattern to avoid or reduce radiation toward a user or other structure are especially made or adapted for use in infringing the ’625 and ’548 Patents and have no substantial noninfringing use.

253. Apple provides user manuals, setup guides, and support materials that instruct customers on how to activate cellular service and configure the Accused Steerable Antenna Mobile Devices for communications using 5G networks.

254. When users follow those instructions and operate the Accused Steerable Antenna Mobile Devices on supported mmWave 5G networks, the devices use sensor information to adjust their steerable antennas' radiation patterns in response to a detected user or other structure.

255. For example, Apple's online support page "Use 5G with your iPhone" instructs users to select "5G On" under "Voice & Data" to use 5G whenever available. When users follow those instructions on mmWave-capable Accused Steerable Antenna Mobile Devices and use the devices for communications on a supported mmWave 5G network, the devices perform the sensor-responsive antenna-steering operations described above.[47]

**v. Apple Find My System**

256. Apple provides a "Find My" service that enables users to locate Apple devices, AirTags, and compatible accessories associated with their Apple accounts and to remotely lock or erase supported Apple devices. The "Find My" service includes Apple's server computers, associated databases, electronic interfaces, and cooperating software on participating Apple devices, including software that detects Bluetooth broadcasts, generates and uploads detection reports, retrieves and displays reported locations, and implements remote device-control ("Accused Find My System").[48]

---

[47] *See* "*Use 5G with your iPhone*," https://support.apple.com/en-us/108383 (accessed Nov. 6, 2026).

[48] *See "One app to find it all,"* https://www.apple.com/icloud/find-my/ (accessed Nov. 9, 2026) ("Location data is encrypted on Apple's servers."); "*About privacy and Location Services in iOS, iPadOS, and watchOS,"* https://support.apple.com/en-us/102515 (accessed Nov. 9, 2026) ("If Location Services is on, your device will periodically send the geo-tagged locations of nearby Wi-

257. The Accused Find My System creates a crowdsourced network in which participating Apple devices detect Bluetooth broadcasts from nearby broadcasting devices and help report the approximate locations of the broadcasting devices to their owners. A participating device that detects such a broadcast acts as a "finder device," enabling the broadcasting device to be detected and located through the crowdsourced network even when the broadcasting device is not itself connected to the internet.[49]

258. When a finder device detects a qualifying Bluetooth broadcast, it encrypts its own current geographic location using a public key obtained from the broadcast and sends the encrypted location report over its internet connection to Apple's iCloud servers. Thus, the reported geographic location is the finder device's location, which is used to approximate the location of the nearby broadcasting device.[50]

---

Fi hotspots and cell towers to Apple to augment Apple's crowd-sourced database of Wi-Fi hotspot and cell tower locations."); *see also "Connect to the Find My network,"* https://developer.apple.com/find-my/ (accessed Nov. 9, 2026) ("[T]he Find My network lets users easily locate their belongings in the Find My app."); *"Using Find My to locate missing Apple devices,"* https://support.apple.com/en-al/guide/security/sece994d0126/web (accessed Nov. 9, 2026) ("Any Apple devices within Bluetooth range that have offline finding enabled can detect a signal from another Apple device configured to allow Find My and read the current broadcast key $P_i$."); *id.* (accessed Nov. 9, 2026) ("[T]he finder devices encrypt their current location information and relay it to Apple."); "*Erase a device in Find My on Mac*," https://support.apple.com/en-al/guide/findmy-mac/fmmbe7bb71f4/mac (accessed Nov. 9, 2026).

[49] *See "Using Find My to locate missing Apple devices,"* https://support.apple.com/en-al/guide/security/sece994d0126/web (accessed Nov. 9, 2026) ("Any Apple devices within Bluetooth range that have offline finding enabled can detect a signal from another Apple device configured to allow Find My and read the current broadcast key $P_i$."); *id.* (accessed Nov. 9, 2026) ("When a missing offline device is located, the user receives a notification and email message to let them know the device has been found.").

[50] *See id.* (accessed Nov. 9, 2026) ("Using an ECIES construction and the public key $P_i$ from the broadcast, the finder devices encrypt their current location information and relay it to Apple"); *id.* (accessed Nov. 9, 2026) ("Find My shows a map location with an approximate address and information on how long ago the device was detected.").

259. The Accused Find My System includes servers that receive and store the encrypted reports for subsequent retrieval.[51] Apple associates an encrypted location report with a server index derived from the public key obtained from the detected Bluetooth broadcast. The server index enables an authorized owner's device to request the corresponding stored reports without requiring Apple to decrypt their location contents.

260. When a user uses the Find My application on another Apple device ("Apple end-user device") to locate an offline broadcasting device associated with the user's Apple Account, the Apple end-user device queries Apple's servers and downloads the corresponding encrypted location reports. The Find My application on the Apple end-user device locally decrypts the reports and displays an approximate location of the offline broadcasting device. Reports from multiple finder devices can be combined to produce a more precise location of the offline broadcasting device's location.

261. For a located offline broadcasting device, the Accused Find My System displays a map location, an approximate address, and information about how long ago the device was detected in the Find My application on the Apple device the user uses to locate it (e.g., Apple end-user device). As additional reports arrive, the displayed location and detection time update automatically. Apple's encryption of the report contents does not prevent its servers from receiving, indexing, storing, and supplying those reports for this user.[52]

---

[51] *See* "*Locate a device in Find Devices on iCloud.com*," https://support.apple.com/en-al/guide/icloud/mmfc0f2442/icloud (accessed Nov. 11, 2026) ("The last known location is stored for up to 7 days.").

[52] *See* *"Using Find My to locate missing Apple devices,"* https://support.apple.com/en-al/guide/security/sece994d0126/web (accessed Nov. 9, 2026) ("If more location reports come in, the current location and time stamp both update automatically[.]"); *id.* (accessed Nov. 9, 2026)

262. Each such report results from successful reception of a Bluetooth transmission by a finder device. The report therefore provides information that the offline broadcasting device was within receivable wireless range of a finder device near the reported geographic location when detection occurred.[53] The reported location therefore reflects an actual wireless detection of the offline broadcasting device within range of a finder device, rather than a location designated by the user.

263. Apple uses signal strength, such as Bluetooth RSSI, between a finder device and an offline broadcasting device as an engineering metric for proximity estimation, which is included in its reports. These detection-based reports constitute experienced performance or perceived communications service quality or value information for mobile wireless devices at geographic locations, because they reflect successful wireless reception and resulting communications availability near those locations. The information is obtained from mobile devices and includes information from the Bluetooth radio-frequency band, including the 2.4 GHz band.[54]

264. Upon information and belief, the Accused Find My System comprises one or more server computers that interface with database resources that include the detection-based reports

---

("The encrypted location is associated with a server index which is computed as the SHA-256 hash of the P-224 public key $P_i$ obtained from the Bluetooth payload.").

[53] *See id.* (accessed Nov. 9, 2026) ("Apple devices within Bluetooth range that have offline finding enabled can detect a signal from another Apple device configured to allow Find My.").

[54] *See "Accessory Proximity Triggered Pairing Specification,"* https://developer.apple.com/download/files/Accessory-Proximity-Triggered-Pairing-Specification.pdf (accessed Nov. 9, 2026) (Apple notes that Bluetooth RSSI is used as an engineering metric for proximity estimation while warning that multipath propagation, physical obstructions, and antenna orientation cause RSSI fluctuations and describes Bluetooth Low Energy (BLE) as its primary mode of communication with Apple devices and cautioning that interference in the 2.4 GHz band could degrade readings).

and records that identify equipment, devices, or property assets owned, controlled, or used by end users. Apple's privacy disclosure for the "Find My" service identifies the data used to provide the service as including Apple account details, device information, and information concerning AirTags, AirPods, and other accessories compatible with the Accused Find My System, including their serial numbers.

265. The Accused Find My System includes electronic interfaces through which finder devices automatically upload detection-based reports to Apple's servers for database storage and through which authorized users retrieve, view, and use the stored information. Successive detections produce additional reports that update the information available to those users.

266. Upon information and belief, the Accused Find My System employs software installed on participating devices that cooperates with Apple's server system to implement a monitoring application that monitors radio operating conditions by detecting receivable Bluetooth broadcasts. Those monitored reception conditions cause the generation and upload of reports used to update the database with the experienced performance or perceived communications quality or service value information described above.

267. Upon information and belief, the Accused Find My System uses infrastructure information, including data from cellular towers, mobile phones, and GPS to locate devices.[55]

268. The Accused Find My System also enables an authorized user to request remote locking, Lost Mode, or remote erasure for supported devices. These device-control functions are distinct from passive Bluetooth location reporting. Upon information and belief, Apple's server

[55] *See* "*Turn Location Services and GPS on or off on your iPhone, iPad, or iPod touch*," https://support.apple.com/en-us/102647 (accessed Nov. 9, 2026) ("Location Services uses GPS and Bluetooth (where they're available), along with crowd-sourced Wi-Fi hotspots and cellular towers to determine the approximate location of your device.").

system receives the user's selected action through an electronic interface of the Accused Find My System and sends corresponding instructions over a network connection to the selected device.

269. For example, Apple instructs a user seeking to protect a missing Apple device to open the "Find My" service application on another Apple device or sign in to the user's Apple account on iCloud.com/find, select the missing Apple device, and turn on Lost Mode or request remote erasure. This functionality allows the user to remotely lock or erase data from the missing Apple device when the device is powered on and connected to the internet.

270. Upon information and belief, Apple's server computers include processors, memory storing executable software, and wired or wireless communication interfaces that process a user's device-control request for the Accused Find My System and send instructions configuring or reconfiguring the selected wireless device based on that request. These components provide the instruction-sending structure identified in the '925 Patent.

271. Upon information and belief, Apple makes and uses the Accused Find My System in the United States, including through its development, testing, and operation of the cooperating server and device software. By assembling and operating a system in the configurations described above, Apple directly infringes at least claims 12 and 14 of the '925 Patent without authorization from MASSIVELY BROADBAND.

272. Upon information and belief, Apple's customers and end users in the United States also directly infringe at least claim 12 of the '925 Patent when they use the Accused Find My System to locate associated devices through the detection, reporting, storage, and retrieval operations described above, which puts the cooperating system into service and obtains its locating benefit. Users who additionally employ the system's remote locking, Lost Mode, or remote erasure functionality on supported devices use the additional instruction-sending functionality recited in

claim 14 of the ’925 Patent.

273. Apple affirmatively encourages these uses of the Accused Find My System by providing software, enabling network participation through account and device settings, and publishing setup and support instructions. For example, Apple’s support article “How to turn on Find My on your iPhone, iPad, or Mac” instructs users to open Settings, select their name and turn on the “Find My” service for the device and network to locate the device even when it is offline.

274. Apple also instructs users to retrieve reported locations and to invoke remote locking and erasure, as described above. Upon information and belief, customers and end users follow these instructions in the United States and thereby engage in directly infringing uses described above. Apple’s instructions are directed to the accused operations, not merely to unrelated uses of a general-purpose computer or smartphone.

275. Upon information and belief, the Accused Find My System uses dedicated software components for Bluetooth-detection reporting and report retrieval and, with respect to claim 14 of the ’925 Patent, to handle remote device-control instructions. These components constitute a material part of the claimed inventions and are especially made or adapted for use in the Accused Find My System. With knowledge of the ’925 Patent and with knowledge that these components are especially made or adapted for infringing use, Apple’s continued sale, offer for sale, or importation of these components contributes to the directly infringing uses by customers and end users as described above.

276. Upon information and belief, Apple sells, offers to sell, or imports into the United States devices embodying dedicated software components of the Accused Find My System. The components have no substantial noninfringing use because their dedicated functions are to perform the accused reporting, retrieval, and device-control operations as part of the Accused Find My

System. With knowledge of the ’925 Patent and with knowledge that these components are especially made or adapted for infringing use, Apple’s continued sale, offer for sale, or importation of these components contributes to the directly infringing uses by customers and end users as described above.

### D. Apple’s Knowledge of Prof. Rappaport’s Work and the Asserted Patents

277. Apple has had knowledge of all of the Asserted Patents, except the ’548 Patent, since at least May 2, 2023.

278. Apple has had knowledge of the application that led to the ’548 Patent since at least May 2, 2023.

279. Prof. Rappaport notified Apple of all but one of the Asserted Patents on May 2, 2023, through a letter to an Apple executive. The letter specifically identified all but one of the Asserted Patents by patent or application number, provided information regarding the claimed inventions, and offered Apple the opportunity to acquire or license the Asserted Patents.

280. On May 10, 2023, an Apple employee responded that Apple would be “happy to review” the Asserted Patents and that Apple “typically take[s] 4–6 weeks for an initial review.”

281. Prof. Rappaport and Apple continued to correspond about the Asserted Patents until June 28, 2023, when Apple ultimately declined Prof. Rappaport’s offer to acquire or license the Asserted Patents.

282. Additionally, on or around November 14, 2025, Apple was served with a subpoena *duces tecum* and *ad testificandum* by Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc. in connection with the *MBB v. Samsung* case.

283. The ’194, ’754, ’337, ’999, ’783, ’763, ’358, ’625, ’548, and ’925 Patents were asserted in the *MBB v. Samsung* case, as was evident on the face of numerous filings on the docket

which are publicly available, including the complaint for patent infringement MASSIVELY BROADBAND filed on June 6, 2025.

284. As to each Asserted Patent that remains unexpired when Apple is served, service of this Complaint will provide Apple with notice of that patent and of how the identified customer and end-user uses infringe it. Upon information and belief, after service and during that patent's remaining term, Apple will continue to directly and indirectly infringe the Asserted Patents in the manner described herein.

285. Furthermore, Prof. Rappaport's inventive work is widely known in the wireless industry.

286. Prof. Rappaport has published and presented extensively on his work, run numerous research centers with prominent industrial affiliates, and had his critical contributions recognized by leading industry organizations.

287. Prof. Rappaport's work is frequently cited in the wireless field. In 2026, Prof. Rappaport was ranked #25 in the United States and #44 globally on Research.com's Top 1000 Scientists in the field of Electronics and Electrical Engineering. He likewise has held annual designations as a highly cited researcher from Clarivate Analytics for 2020–2024.

288. Prof. Rappaport's seminal paper, "Millimeter Wave Mobile Communications for 5G Cellular: It Will Work!" published in 2013, has been cited by over 9,940 articles and 100 patents.

289. Apple is very familiar with Prof. Rappaport's work.

290. Apple is an industrial affiliate member of WNCG, the research center Prof. Rappaport founded at UT Austin in 2002, and is an industrial affiliate member of NYU WIRELESS, the research center Prof. Rappaport founded at New York University in 2012.

291. As part of Prof. Rappaport's involvement with NYU WIRELESS, Prof. Rappaport developed channel measurement systems to test and measure the path loss of millimeter wave bands in outdoor environments in order to assess the feasibility of millimeter wave frequency bands for mobile broadband access. Prof. Rappaport collected data in Austin, Texas and New York City during his tenure at UT Austin and NYU, respectively.

292. Prof. Rappaport frequently speaks at industry conferences and is often asked to offer keynote addresses. Upon information and belief, Apple employees regularly attend those same conferences.[56]

293. Prof. Rappaport has co-authored more than sixty articles in the field of wireless communications with co-authors who are currently Apple employees.[57]

294. Prof. Rappaport is a named inventor of at least one patent and two applications for which a current Apple employee also is a named inventor.[58]

---

[56] *See, e.g.,* Mohamed bin Zayed Univ. Artificial Intel., *The Abu Dhabi AI Summit – Edge & Beyond*, Nat'l Sci. Found. and Dep't Homeland Sec., https://sites.duke.edu/abudhabisummit2026/ (last visited Nov. 12, 2026).

[57] *See, e.g.*, T. S. Rappaport, S. Hur, *et al.*, "Proposal on Millimeter-Wave Channel Modeling for 5G Cellular System," *IEEE J. Selected Topics in Signal Processing*, vol. 10, no. 3, April 2016 at 454-69; T. S. Rappaport, S. Agarwal, *et al.*, "On-chip integrated antenna structures in CMOS for 60 GHz WPAN systems," *IEEE J. Selected Areas in Communications*, vol. 27, no. 8, Oct. 2009 at 1367-1378; T.S. Rappaport, G. MacCartney, *et al.*, "Wideband Millimeter-Wave Propagation Measurements and Channel Models for Future Wireless Communications System Design," *IEEE Transactions on Commc'ns*, vol. 63, no. 9, Sept. 2015 at 3029-3056; T.S. Rappaport, D. Shakya, *et al.*, "142 GHz Sub-Terahertz Radio Propagation Measurements and Channel Characterization in Factory Buildings," *IEEE Transactions on Wireless Commc'ns*, vol. 23, no. 7, Dec. 2023 at 7127-7143.

[58] U.S. Patent No. 10,263,763 titled "Systems, methods, and computer-accessible media for measuring or modeling a wideband, millimeter-wave channel and methods and systems for calibrating same"; WIPO Publication No. WO2025054338A2 titled "Systems and methods for automatic absolute timing in distributed clock systems using precision time synchronizing combined with reference propagation-based time drift correction"; WIPO Publication No. WO2025212936A1 titled "System and method of waste factor based power consumption reducing data communication and processing."

295. Apple also has cited to Prof. Rappaport's seminal textbook—*Wireless Communications: Principles and Practice*, Prentice Hall (1996)—in support of various Petitions for Inter Partes Review asserted against certain patents in the wireless space.[59]

296. Apple was aware of several of the Asserted Patents based on the prosecution history of several of Apple's own patents.

297. During prosecution of U.S. Patent Application No. 11/970,504, which was filed by Apple and has since issued as U.S. Patent No. 8,207,906, the examiner cited U.S. Patent Application Publication No. 2005/0042999, which at the time it was cited by the examiner had already issued as the '194 Patent.

298. During prosecution of U.S. Patent Application No. 13/601,804, which was filed by Apple and has since issued as U.S. Patent No. 9,043,135, the examiner cited U.S. Patent Application Publication No. 2010/0250269, which at the time it was cited by the examiner had already issued as U.S. Patent No. 8,725,700 (the "'700 Patent"). The '925 Patent is a continuation of the '700 Patent, and likewise had already issued at the time U.S. Patent Application Publication No. 2010/0250269 was cited by the examiner.

299. When filing U.S. Patent Application No. 13/743,246, Apple filed an IDS on May 20, 2014 citing U.S. Patent Application Publication No. 2010/0250269, which had already issued as U.S. Patent No. 8,725,700 on May 13, 2014. When filing U.S. Patent Application No. 13/743,242, Apple filed an IDS on May 20, 2014 citing U.S. Patent Application Publication No. 2010/0250269, which had already issued as U.S. Patent No. 8,725,700. The '925 Patent, a continuation of the '700 Patent, likewise had already issued at the time of filing the IDS.

---

[59] *See, e.g.*, *Apple Inc. v. Smart Mobile Techs. LLC*, IPR2022-01223, Petition for Inter Partes Review, p. 27 (July 6, 2022); *Apple Inc. v. Telefonaktiebolaget LM Ericsson*, IPR2016-00050, Ex. 1003 (Expert Dec. of Dr. John R. Grindon, D.S.C.), pp. 70–78 (Oct. 19, 2015).

300. During prosecution of U.S. Patent Application No. 14/173,689, which was filed by Apple and has since issued as U.S. Patent No. 9,591,052, the examiner cited U.S. Patent Application Publication No. 2009/0070379, which had already issued as U.S. Patent No. 8,224,794 (the "'794 Patent") and had been in force for more than four years at the time of the citation. The '925 Patent, a continuation of the '794 Patent, likewise had already issued at the time U.S. Patent Application Publication No. 2009/0070379 was cited by the examiner.

301. During prosecution of U.S. Patent Application No. 13/363,743, which was filed by Apple and has since issued as U.S. Patent No. 9,270,012, the examiner cited U.S. Patent Application Publication No. 2010/0060531, which at the time it was cited by the examiner had already issued as the '763 Patent.

302. During prosecution of U.S. Patent Application No. 15/071,795, which was filed by Apple and has since issued as U.S. Patent No. 9,997,828, the examiner cited U.S. Patent Application Publication No. 2010/0060531, which at the time it was cited by the examiner had already issued as the '763 Patent and had been in force for more than five years. The '358 Patent, a continuation of the '763 Patent, likewise had already issued and had been in force for more than four years at the time U.S. Patent Application Publication No. 2010/0060531 was cited by the examiner.

303. When filing U.S. Patent Application No. 16/145,614, Apple filed an IDS on September 28, 2018 citing U.S. Patent Application Publication No. 2013/0141294, which at the time of the filing of Apple's IDS had already issued as the '358 Patent and had been in force for more than four years. The '763 Patent, of which the '358 Patent is a continuation, likewise had already issued and had been in force for more than five years at the time of filing Apple's IDS.

304. When filing U.S. Patent Application No. 14/980,603, Apple filed an IDS citing U.S. Patent Application Publication No. 2013/0328723, which later issued as the ’625 Patent.

305. During prosecution of U.S. Patent Application No. 16/553,045, which was filed by Apple and has since issued as U.S. Patent No. 11,303,022, the examiner cited U.S. Patent Application Publication No. 2013/0328723, which later issued as the ’625 Patent.

306. In light of the foregoing, Apple had specific knowledge of one or more of the Asserted Patents and/or was willfully blind to the Asserted Patents.

**FIRST CAUSE OF ACTION**
**(Infringement of the ’194 Patent)**

307. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

308. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 4, 7-9, 12-14, 17, 20, 22, and 23 of the ’194 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops within the United States, including this District.

309. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 4, 7-9, 12-14, 17, 20, 22, and 23 of the ’194 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

310. As a direct and proximate result of Apple's direct infringement of the '194 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

311. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 4, 7-9, 12-14, 17, 20, 22, and 23 of the '194 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 4, 7-9, 12-14, 17, 20, 22, and 23 of the '194 Patent, where the component is a material part of at least claims 1, 4, 7-9, 12-14, 17, 20, 22, and 23 of the '194 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 4, 7-9, 12-14, 17, 20, 22, and 23 of the '194 Patent.

312. Apple knew of, by at least May 2, 2023, and at least as of the filing date of the Complaint, or has been willfully blind to the existence of, the '194 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1, 4, 7-9, 12-14, 17, 20, 22, and 23 of the '194 Patent, and intended that its actions would induce and contribute to such direct infringement.

313. As a direct and proximate result of Apple's indirect infringement of the '194 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

314. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’194 Patent, pursuant to 35 U.S.C. § 271.

315. Apple has committed these acts of infringement without license or authorization.

316. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND’s rights in the ’194 Patent.

317. As a result of Apple’s willful infringement of the ’194 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple’s infringement, together with enhanced damages, attorneys’ fees, interest, and costs.

## SECOND CAUSE OF ACTION
**(Infringement of the ’812 Patent)**

318. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

319. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 2, 5, 6, 13, 16-18, 22, and 25 of the ’812 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops within the United States, including this District.

320. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 2, 5, 6, 13, 16-18, 22, and 25 of the ’812 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Wireless Relay Devices and the Accused Wireless

Relay Laptops within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

321. As a direct and proximate result of Apple's direct infringement of the '812 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

322. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 2, 5, 6, 13, 16-18, 22, and 25 of the '812 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 2, 5, 6, 13, 16-18, 22, and 25 of the '812 Patent, where the component is a material part of at least claims 1, 2, 5, 6, 13, 16-18, 22, and 25 of the '812 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 2, 5, 6, 13, 16-18, 22, and 25 of the '812 Patent.

323. Apple knew of, by at least May 2, 2023, or has been willfully blind to the existence of, the '812 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1, 2, 5, 6, 13, 16-18, 22, and 25 of the '812 Patent, and intended that its actions would induce and contribute to such direct infringement.

324. As a direct and proximate result of Apple's indirect infringement of the '812 Patent,

MASSIVELY BROADBAND has been and continues to be damaged.

325. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’812 Patent, pursuant to 35 U.S.C. § 271.

326. Apple has committed these acts of infringement without license or authorization.

327. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND’s rights in the ’812 Patent.

328. As a result of Apple’s willful infringement of the ’812 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple’s infringement, together with enhanced damages, attorneys’ fees, interest, and costs.

**THIRD CAUSE OF ACTION**
**(Infringement of the ’754 Patent)**

329. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

330. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1-3, 14, and 23-25 of the ’754 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops within the United States, including this District.

331. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1-3, 14, and 23-25 of the ’754 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops within

the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

332. As a direct and proximate result of Apple's direct infringement of the '754 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

333. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1-3, 14, and 23-25 of the '754 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1-3, 14, and 23-25 of the '754 Patent, where the component is a material part of at least claims 1-3, 14, and 23-25 of the '754 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1-3, 14, and 23-25 of the '754 Patent.

334. Apple knew of, by at least as of May 2, 2023, or has been willfully blind to the existence of, the '754 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1-3, 14, and 23-25 of the '754 Patent, and intended that its actions would induce and contribute to such direct infringement.

335. As a direct and proximate result of Apple's indirect infringement of the '754 Patent,

MASSIVELY BROADBAND has been and continues to be damaged.

336. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’754 Patent, pursuant to 35 U.S.C. § 271.

337. Apple has committed these acts of infringement without license or authorization.

338. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND’s rights in the ’754 Patent.

339. As a result of Apple’s willful infringement of the ’754 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple’s infringement, together with enhanced damages, attorneys’ fees, interest, and costs.

## FOURTH CAUSE OF ACTION
## (Infringement of the ’337 Patent)

340. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

341. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 6, 8, 9, 11, 12, 15, 17, 26, 29, 30, 32, 33, 35, 48, and 49 of the ’337 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops within the United States, including this District.

342. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 6, 8, 9, 11, 12, 15, 17, 26, 29, 30, 32, 33, 35, 48, and 49 of the ’337 Patent, by making, having made, using, selling, offering

to sell, supplying, distributing, and/or importing the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

343. As a direct and proximate result of Apple's direct infringement of the '337 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

344. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 6, 8, 9, 11, 12, 15, 17, 26, 29, 30, 32, 33, 35, 48, and 49 of the '337 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Wireless Relay Devices and the Accused Wireless Relay Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 6, 8, 9, 11, 12, 15, 17, 26, 29, 30, 32, 33, 35, 48, and 49 of the '337 Patent, where the component is a material part of at least claims 1, 6, 8, 9, 11, 12, 15, 17, 26, 29, 30, 32, 33, 35, 48, and 49 of the '337 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 6, 8, 9, 11, 12, 15, 17, 26, 29, 30, 32, 33, 35, 48, and 49 of the '337 Patent.

345. Apple knew of, by at least May 2, 2023, or has been willfully blind to, the existence of the '337 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1, 6, 8, 9, 11, 12, 15, 17, 26, 29, 30, 32, 33, 35, 48, and

49 of the ’337 Patent, and intended that its actions would induce or contribute to such direct infringement.

346. As a direct and proximate result of Apple’s indirect infringement of the ’337 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

347. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’337 Patent, pursuant to 35 U.S.C. § 271.

348. Apple has committed these acts of infringement without license or authorization.

349. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND’s rights in the ’337 Patent.

350. As a result of Apple’s willful infringement of the ’337 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple’s infringement, together with enhanced damages, attorneys’ fees, interest, and costs.

**<u>FIFTH CAUSE OF ACTION</u>**
**(Infringement of the ’999 Patent)**

351. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

352. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 8, 9, 11-15, 21-23, 26-28, 31, 32, and 39 of the ’999 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Wireless Relay Devices within the United States, including this District.

353. Upon information and belief, Apple has directly infringed and continues to directly

infringe, literally or under the doctrine of equivalents, at least claims 1, 8, 9, 11-15, 21-23, 26-28, 31, 32, and 39 of the ’999 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Wireless Relay Devices within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

354. As a direct and proximate result of Apple’s direct infringement of the ’999 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

355. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 8, 9, 11-15, 21-23, 26-28, 31, 32, and 39 of the ’999 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Wireless Relay Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Wireless Relay Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 8, 9, 11-15, 21-23, 26-28, 31, 32, and 39 of the ’999 Patent, where the component is a material part of at least claims 1, 8, 9, 11-15, 21-23, 26-28, 31, 32, and 39 of the ’999 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 8, 9, 11-15, 21-23, 26-28, 31, 32, and 39 of the ’999 Patent.

356. Apple knew of, by at least May 2, 2023, or has been willfully blind to the existence of, the ’999 Patent and the fact that its actions would induce or contribute to direct infringement

by its customers or end users of at least claims 1, 8, 9, 11-15, 21-23, 26-28, 31, 32, and 39 of the ’999 Patent, and intended that its actions would induce or contribute to such direct infringement.

357. As a direct and proximate result of Apple’s indirect infringement of the ’999 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

358. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’999 Patent, pursuant to 35 U.S.C. § 271.

359. Apple has committed these acts of infringement without license or authorization.

360. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND’s rights in the ’999 Patent.

361. As a result of Apple’s willful infringement of the ’999 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple’s infringement, together with enhanced damages, attorneys’ fees, interest, and costs.

**SIXTH CAUSE OF ACTION**
**(Infringement of the ’783 Patent)**

362. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

363. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 2, 3, 6, and 13-16 of the ’783 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Wireless Relay Devices within the United States, including this District.

364. Upon information and belief, Apple has directly infringed and continues to directly

infringe, literally or under the doctrine of equivalents, at least claims 1, 2, 3, 6, and 13-16 of the ’783 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Wireless Relay Devices within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

365. As a direct and proximate result of Apple’s direct infringement of the ’783 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

366. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 2, 3, 6, and 13-16 of the ’783 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Wireless Relay Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Wireless Relay Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 2, 3, 6, and 13-16 of the ’783 Patent, where the component is a material part of at least claims 1, 2, 3, 6, and 13-16 of the ’783 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 2, 3, 6, and 13-16 of the ’783 Patent.

367. Apple knew (at least as of the filing date of the Complaint) or has been willfully blind to the existence of the ’783 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1, 2, 3, 6, and 13-16 of the ’783 Patent, and intended that its actions would induce or contribute to such direct infringement.

368. As a direct and proximate result of Apple's indirect infringement of the '783 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

369. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the '783 Patent, pursuant to 35 U.S.C. § 271.

370. Apple has committed these acts of infringement without license or authorization.

371. In committing these acts of infringement, Apple acted recklessly and willfully with regard to MASSIVELY BROADBAND's rights in the '783 Patent.

372. As a result of Apple's willful infringement of the '783 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple's infringement, together with enhanced damages, attorneys' fees, interest, and costs.

**SEVENTH CAUSE OF ACTION**
**(Infringement of the '763 Patent)**

373. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

374. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 3, 4, 6, 7, 13, 15, and 16 of the '763 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Antenna-Tuning Mobile Devices within the United States, including this District.

375. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claim 13 of the '763 Patent, as proscribed by 35 U.S.C. §§ 271 et seq., by, without permission or authority from MASSIVELY BROADBAND, making, having made,

using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Multiband Antenna Laptops within the United States, including this District. These laptops include at least models A3426, A3427, A3428, A3429, A3112, A3401, A3185, A3403, A3186, A3240, A3241, A3434, A2442, A2485, A2681, A2779, A2780, A2991, A2992, and A3114.

376. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 3, 4, 6, 7, 13, 15, and 16 of the '763 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Antenna-Tuning Mobile Devices within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

377. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claim 13 of the '763 Patent by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Multiband Antenna Laptops within the United States, including this District, without permission or authority from MASSIVELY BROADBAND. The Accused Multiband Antenna Laptops include at least one shared multiband antenna connected to receiver, transmitter, or transceiver circuitry that operates simultaneously in two or more particular frequency bands, including the 5 GHz or 6 GHz Wi-Fi band and the 2.4 GHz Bluetooth band.

378. As a direct and proximate result of Apple's direct infringement of the '763 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

379. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 3, 4, 6, 7, 13, 15, and 16 of the '763 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing

its customers and/or end users to use the Accused Antenna-Tuning Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Antenna-Tuning Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 3, 4, 6, 7, 13, 15, and 16 of the '763 Patent, where the component is a material part of at least claims 1, 3, 4, 6, 7, 13, 15, and 16 of the '763 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 3, 4, 6, 7, 13, 15, and 16 of the '763 Patent.

380. Upon information and belief, Apple is now and/or has been indirectly infringing at least claim 13 of the '763 Patent, as proscribed by 35 U.S.C. §§ 271 et seq., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Multiband Antenna Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Multiband Antenna Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States, Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuitry and associated RF connections to a shared multiband antenna, as incorporated in the Accused Multiband Antenna Laptops. This circuitry-and-antenna combination is a material part of the invention claimed in at least claim 13 of the '763 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, and Apple knows the combination to be especially made or

especially adapted for use in infringing at least claim 13 of the ’763 Patent. Customers and end users directly infringe at least claim 13 by using the Accused Multiband Antenna Laptops for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band through a shared multiband antenna. Apple encourages those uses by providing the laptops and instructions for connecting and using Wi-Fi networks and Bluetooth accessories.

381. Apple knew of, at least as of May 2, 2023, and at least as of the filing date of the Complaint, or has been willfully blind to the existence of, the ’763 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1, 3, 4, 6, 7, 13, 15, and 16 of the ’763 Patent, and intended that its actions would induce or contribute to such direct infringement.

382. Apple knew of, at least as of May 2, 2023, and at least as of the filing date of the Complaint, or has been willfully blind to the existence of, the ’763 Patent. Upon information and belief, Apple knows or has been willfully blind to the fact that its actions induce or contribute to direct infringement by its customers or end users of at least claim 13 of the ’763 Patent through their use of the Accused Multiband Antenna Laptops for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band through a shared multiband antenna, and intends that its actions induce or contribute to such direct infringement.

383. As a direct and proximate result of Apple’s indirect infringement of the ’763 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

384. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’763 Patent, pursuant to 35 U.S.C. § 271.

385. Apple has committed these acts of infringement without license or authorization.

386. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND's rights in the '763 Patent.

387. As a result of Apple's willful infringement of the '763 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple's infringement, together with enhanced damages, attorneys' fees, interest, and costs.

**EIGHTH CAUSE OF ACTION**
**(Infringement of the '358 Patent)**

388. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

389. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 3, 4, 6-9, 12, 13, 19, and 21-24 of the '358 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Antenna-Tuning Mobile Devices within the United States, including this District.

390. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claim 19 of the '358 Patent, as proscribed by 35 U.S.C. §§ 271 et seq., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Multiband Antenna Laptops within the United States, including this District. These laptops include at least models A3426, A3427, A3428, A3429, A3112, A3401, A3185, A3403, A3186, A3240, A3241, A3434, A2442, A2485, A2681, A2779, A2780, A2991, A2992, and A3114.

391. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 3, 4, 6-9, 12, 13, 19, and 21-24 of the ’358 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Antenna-Tuning Mobile Devices within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

392. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claim 19 of the ’358 Patent by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Multiband Antenna Laptops within the United States, including this District, without permission or authority from MASSIVELY BROADBAND. The Accused Multiband Antenna Laptops include antennas having elements or sub-elements and forming an antenna array, with at least one shared multiband antenna connected to receiver, transmitter, or transceiver circuitry supporting operation in multiple particular frequency bands, including simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band.

393. As a direct and proximate result of Apple’s direct infringement of the ’358 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

394. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 3, 4, 6-9, 12, 13, 19, and 21-24 of the ’358 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Antenna-Tuning Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the

Accused Antenna-Tuning Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 3, 4, 6-9, 12, 13, 19, and 21-24 of the ’358 Patent, where the component is a material part of at least claims 1, 3, 4, 6-9, 12, 13, 19, and 21-24 of the ’358 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 3, 4, 6-9, 12, 13, 19, and 21-24 of the ’358 Patent.

395. Upon information and belief, Apple is now and/or has been indirectly infringing at least claim 19 of the ’358 Patent, as proscribed by 35 U.S.C. §§ 271 et seq., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Multiband Antenna Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Multiband Antenna Laptops in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States, Wi-Fi and Bluetooth receiver, transmitter, or transceiver circuitry and associated RF connections to antennas having elements or sub-elements and forming an antenna array, as incorporated in the Accused Multiband Antenna Laptops. This circuitry-and-antenna combination includes at least one shared multiband antenna, is a material part of the invention claimed in at least claim 19 of the ’358 Patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use, and Apple knows the combination to be especially made or especially adapted for use in infringing at least claim 19 of the ’358 Patent. Customers and end

users directly infringe at least claim 19 by using the Accused Multiband Antenna Laptops for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band through a shared multiband antenna forming part of an antenna array having elements or sub-elements. Apple encourages those uses by providing the laptops and instructions for connecting and using Wi-Fi networks and Bluetooth accessories.

396. Apple knew of, at least as of May 2, 2023, and at least as of the filing date of the Complaint, or has been willfully blind to the existence of, the ’358 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1, 3, 4, 6-9, 12, 13, 19, and 21-24 of the ’358 Patent, and intended that its actions would induce or contribute to such direct infringement.

397. Apple knew of, at least as of May 2, 2023, and at least as of the filing date of the Complaint, or has been willfully blind to the existence of, the ’358 Patent. Upon information and belief, Apple knows or has been willfully blind to the fact that its actions induce or contribute to direct infringement by its customers or end users of at least claim 19 of the ’358 Patent through their use of the Accused Multiband Antenna Laptops for simultaneous Wi-Fi communications in the 5 GHz or 6 GHz band and Bluetooth communications in the 2.4 GHz band through a shared multiband antenna forming part of an antenna array having elements or sub-elements, and intends that its actions induce or contribute to such direct infringement.

398. As a direct and proximate result of Apple’s indirect infringement of the ’358 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

399. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’358 Patent, pursuant to 35 U.S.C. § 271.

400. Apple has committed these acts of infringement without license or authorization.

401. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND's rights in the '358 Patent.

402. As a result of Apple's willful infringement of the '358 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple's infringement, together with enhanced damages, attorneys' fees, interest, and costs.

**NINTH CAUSE OF ACTION**
**(Infringement of the '625 Patent)**

403. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

404. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1-3, 5-7, 9, 11, 12, 15, 17-19, 21, 23, 24, 27, 29, 30, 31, and 33 of the '625 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Steerable Antenna Mobile Devices within the United States, including this District.

405. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, claims 1-3, 5-7, 9, 11, 12, 15, 17-19, 21, 23, 24, 27, 29, 30, 31, and 33 of the '625 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Steerable Antenna Mobile Devices within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

406. As a direct and proximate result of Apple's direct infringement of the '625 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

407. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1-3, 5-7, 9, 11, 12, 15, 17-19, 21, 23, 24, 27, 29, 30, 31, and 33 of the ’625 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Steerable Antenna Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Steerable Antenna Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1-3, 5-7, 9, 11, 12, 15, 17-19, 21, 23, 24, 27, 29, 30, 31, and 33 of the ’625 Patent, where the component is a material part of at least claims 1-3, 5-7, 9, 11, 12, 15, 17-19, 21, 23, 24, 27, 29, 30, 31, and 33 of the ’625 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1-3, 5-7, 9, 11, 12, 15, 17-19, 21, 23, 24, 27, 29, 30, 31, and 33 of the ’625 Patent.

408. Apple knew of, by at least May 2, 2023, and at least by the filing date of this Complaint, or has been willfully blind to the existence of, the ’625 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1-3, 5-7, 9, 11, 12, 15, 17-19, 21, 23, 24, 27, 29, 30, 31, and 33 of the ’625 Patent, and intended that its actions would induce or contribute to such direct infringement.

409. As a direct and proximate result of Apple’s indirect infringement of the ’625 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

410. By engaging in the conduct described herein, Apple has injured MASSIVELY

BROADBAND and thus is liable for infringement of the ’625 Patent, pursuant to 35 U.S.C. § 271.

411. Apple has committed these acts of infringement without license or authorization.

412. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND’s rights in the ’625 Patent.

413. As a result of Apple’s willful infringement of the ’625 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple’s infringement, together with enhanced damages, attorneys’ fees, interest, and costs.

## TENTH CAUSE OF ACTION
## (Infringement of the ’548 Patent)

414. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

415. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 1, 4, 6, 7, 10, 12, and 15 of the ’548 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, inducing others to use, and/or contributing to use by others of the Accused Steerable Antenna Mobile Devices within the United States, including this District.

416. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 4, 6, 7, 10, 12, and 15 of the ’548 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Steerable Antenna Mobile Devices within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

417. As a direct and proximate result of Apple’s direct infringement of the ’548 Patent,

MASSIVELY BROADBAND has been and continues to be damaged.

418. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 1, 4, 6, 7, 10, 12, and 15 of the ’548 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Steerable Antenna Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Steerable Antenna Mobile Devices in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 1, 4, 6, 7, 10, 12, and 15 of the ’548 Patent, where the component is a material part of at least claims 1, 4, 6, 7, 10, 12, and 15 of the ’548 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 1, 4, 6, 7, 10, 12, and 15 of the ’548 Patent.

419. Apple knew of, by at least November 14, 2025, and at least by the filing date of this Complaint, or has been willfully blind to the existence of, the ’548 Patent and the fact that its actions would induce or contribute to direct infringement by its customers or end users of at least claims 1, 4, 6, 7, 10, 12, and 15 of the ’548 Patent, and intended that its actions would induce or contribute to such direct infringement.

420. As a direct and proximate result of Apple’s indirect infringement of the ’548 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

421. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the ’548 Patent, pursuant to 35 U.S.C. § 271.

422. Apple has committed these acts of infringement without license or authorization.

423. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND's rights in the '548 Patent.

424. As a result of Apple's willful infringement of the '548 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple's infringement, together with enhanced damages, attorneys' fees, interest, and costs.

**ELEVENTH CAUSE OF ACTION**
**(Infringement of the '925 Patent)**

425. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

426. Upon information and belief, Apple is now and/or has been directly and/or indirectly infringing at least claims 12 and 14 of the '925 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, making, having made, using, selling, offering to sell, supplying, distributing, importing, and/or inducing others to use the Accused Find My System within the United States, including this District.

427. Upon information and belief, Apple has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 12 and 14 of the '925 Patent, by making, having made, using, selling, offering to sell, supplying, distributing, and/or importing the Accused Find My System within the United States, including this District, without permission or authority from MASSIVELY BROADBAND.

428. As a direct and proximate result of Apple's direct infringement of the '925 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

429. Upon information and belief, Apple is now and/or has been indirectly infringing at least claims 12 and 14 of the '925 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq*., by, without permission or authority from MASSIVELY BROADBAND, (i) actively inducing its customers and/or end users to use the Accused Find My System in a directly infringing manner, literally or under the doctrine of equivalents, within the United States, including this District, and/or (ii) contributing to the use by its customers and/or end users of the Accused Find My System in a directly infringing manner, literally or under the doctrine of equivalents, within the United States by offering to sell or selling within the United States, or importing into the United States a component of, or for use in, at least claims 12 and 14 of the '925 Patent, where the component is a material part of at least claims 12 and 14 of the '925 Patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use, knowing such component to be especially made or especially adapted for use in at least claims 12 and 14 of the '925 Patent.

430. Apple knew of, by at least May 2, 2023, and at least by the filing date of this Complaint, or has been willfully blind to the existence of, the '925 Patent and the fact that its actions would induce direct infringement by its customers or end users of at least claims 12 and 14 of the '925 Patent, and intended that its actions would induce such direct infringement.

431. As a direct and proximate result of Apple's indirect infringement of the '925 Patent, MASSIVELY BROADBAND has been and continues to be damaged.

432. By engaging in the conduct described herein, Apple has injured MASSIVELY BROADBAND and thus is liable for infringement of the '925 Patent, pursuant to 35 U.S.C. § 271.

433. Apple has committed these acts of infringement without license or authorization.

434. In committing these acts of infringement, Apple has acted recklessly and willfully with regard to MASSIVELY BROADBAND's rights in the '925 Patent.

435. As a result of Apple's willful infringement of the '925 Patent, MASSIVELY BROADBAND has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Apple's infringement, together with enhanced damages, attorneys' fees, interest, and costs.

## JURY DEMAND

MASSIVELY BROADBAND hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, MASSIVELY BROADBAND requests that:

A. The Court find that Apple has directly infringed the Asserted Patents and hold Apple liable for such infringement;

B. The Court find that Apple has indirectly infringed the Asserted Patents by inducing its customers to directly infringe the Asserted Patents and hold Apple liable for such infringement;

C. The Court find that Apple has indirectly infringed the Asserted Patents by contributing to Apple's customers' direct infringement of the Asserted Patents and hold Apple liable for such infringement;

D. The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate MASSIVELY BROADBAND for Apple's infringement of the Asserted Patents, including both pre- and post-judgment interest and costs as fixed by the Court;

E. The Court permanently enjoin Apple and its officers, agents, employees, and all persons in active concert or participation with any of them, from infringing the subsisting Asserted Patents, and from manufacturing, selling, or offering for sale the Accused Products, and grant all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

F. The Court increase the damages to be awarded to MASSIVELY BROADBAND to three times the amount found by the jury or assessed by the Court;

G. The Court declare that this is an exceptional case entitling MASSIVELY BROADBAND to its reasonable attorneys' fees under 35 U.S.C. § 285;

H. The Court direct Apple to mark its Accused Products with the Asserted Patents pursuant to 35 U.S.C. § 287; and

I. The Court award such other relief as the Court may deem just and proper.

Dated: November 23, 2026

Respectfully submitted,

*/s/ Matthew Blair*

Matthew Blair
TX Bar No. 24109648
matthew.blair@klgates.com
**K&L GATES LLP**
2801 Vía Fortuna
Suite 650
Austin, Texas 78746
Telephone: (512) 482-6800

Patrick J. McElhinny (*pro hac vice forthcoming*)
patrick.mcelhinny@klgates.com
Mark G. Knedeisen (*pro hac vice forthcoming*)
mark.knedeisen@klgates.com
Christopher M. Verdini (*pro hac vice forthcoming*)
christopher.verdini@klgates.com
Anna Shabalov (*pro hac vice forthcoming*)
anna.shabalov@klgates.com
Rachel E. Ellenberger (*pro hac vice forthcoming*)
rachel.ellenberger@klgates.com
**K&L GATES LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501

***Attorneys for Plaintiff MASSIVELY BROADBAND LLC***